**STATE of Tennessee, Appellee,**

v.

**Gary TIZARD, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Nov. 10, 1994.

[redacted]

---

David L. Raybin, Nashville, for appellant.

Charles W. Burson, Atty. Gen., and Eugene J. Honea, Asst. Atty. Gen., Nashville, Lawrence Ray Whitley, Dist. Atty. Gen., and Dee Gay, Asst. Dist. Atty. Gen., Gallatin, for appellee.

## *OPINION*

TIPTON, Judge.

The defendant, Gary Tizard, was convicted by a jury in the Sumner County Criminal Court of two counts of sexual battery by means of fraud, a Class E felony. He was sentenced as a Range I, standard offender to concurrent one-year terms and fined a total of fifty-six hundred dollars. The defendant appeals as of right and presents the following claims:

(1) The evidence was insufficient to prove that the contacts in question were accomplished by fraud.

(2) The trial court erred in admitting evidence of, and argument about, sexually explicit books and video tapes and the defendant's statement about the sexual preferences of persons with whom he lived.

(3) The trial court erred in limiting cross-examination of the victim which related to impeachment.

(4) The trial court erred in allowing witnesses to testify about statements to them by the victim concerning the events in that the statements did not constitute "fresh complaint."

(5) The trial court erred in admitting evidence of the behavioral changes in the victim occurring after the events in issue.

(6) The trial court erred in allowing a physician to testify about proper medical procedure for physical examinations.

(7) The trial court erred in admitting evidence of the level of steroids present in the victim.

(8) The defendant was denied his constitutional right to a public trial by the trial court's exclusion of certain student spectators from the trial.

We conclude that the convictions must be reversed because of the improper admission of sexually explicit evidence unrelated to the offenses.

The case relates to events occurring while the victim, a seventeen-year-old male, was being treated by the defendant, a medical doctor. The defendant was indicted on three counts of sexual battery alleged to have occurred on January 17, 24 and 31, 1990. Each count alleged that the defendant had sexual contact with the victim by means of fraud. *See* T.C.A. §§ 39–13–503(a)(3) and –505(a). The jury acquitted the defendant on the January 17 charge, but convicted him under the two remaining counts.

The victim testified that he was a junior in high school at the time of the events. He was a holder of a black belt in karate and wanted to compete in the men's division of future karate tournaments. He thought that his ability would be enhanced by steroids and asked other acquaintances about their acquisition. He said that he was referred to the defendant and indicated that he understood that he would not have to pay for the treatments. Also, he admitted that he did not tell his parents about seeing the defendant or using steroids.

The victim testified that he telephoned the defendant and discussed his desire for steroids, the defendant indicating that testosterone might be appropriate. The victim stated that on January 3, 1990, his seventeenth birthday, he went to the defendant's office after school. He signed in and had to wait over an hour before the defendant saw him in an examining room. He said that the defendant was alone and asked him to remove his clothes, which he did. He sat on the examining table and the defendant checked his ears, nose and throat and felt various muscles in his body. He stood up at the defendant's request and coughed while the defendant was feeling his testicles, which the victim testified was a hernia test. The victim stated that he got dressed and that the defendant gave him a diet plan and the name of a high school football coach who would set up a workout program. He said that the defendant told him to return in two weeks to start a cycle of testosterone treatment.

However, the victim returned only one week later, on January 10, after school. He said that the defendant came into the examining room alone and asked about the diet and workout program. He said he was told to remove his clothes, which he did, and that he received an examination to the same extent as before. He then received an injection in the hip, which he stated that the defendant said was testosterone cypionate. He was told to stay on the diet, keep working out, and return in a week.

On January 17, the victim returned to the defendant's office after school. He testified that the same procedures and examination as before were repeated. However, he said that after the hernia test, the defendant, who was seated on the stool, held his penis and looked at it. He testified that the defendant rubbed the shaft of the penis with his hand for a couple of minutes until it was erect. Afterwards, the defendant had the victim lie on the table and gave him another injection. The defendant told the victim to stay on his diet, keep working out, and return in a week.

The victim testified that, before his next visit, he asked a pharmacist, at a hospital where his mother worked, how someone could get a prescription for steroids and was told that only a doctor could get it for someone. He stated that he had asked this out of curiosity.

The victim returned to the defendant's office after school on January 24. He testified that the same procedures, examinations and contact as occurred on the 17th were repeated. He said that the defendant rubbed his penis until it was erect and told him to lie on his stomach on the table. He stated that while he was on the table, the defendant felt various muscles on the back part of his body, including his bottom, and reached under and felt his testicles. He said the defendant had him lie on his back and started rubbing the shaft of his penis for a couple of minutes. The victim indicated that the defendant's face was close to his penis. Then, the defendant stopped, had the victim turn over, and gave him another injection. The victim testified that no other doctor had ever examined his penis before, but he did not think anything wrong was occurring. He also stated that he was pleased with the progress he was making from the injections.

The victim testified that he returned to the defendant's office on January 31. He said that the defendant came to the examining room alone and asked him about his workout and diet. He said the defendant told him to take his shirt off, which he did. The defendant checked his ears, nose, throat and various upper body muscles. He said that while he was standing, the defendant was sitting on a stool.

The victim testified that the defendant unfastened the victim's pants, pulled them down and took them off. He said he was

checked for a hernia and the defendant began rubbing his penis as before. He stated that he lay on the table at the defendant's request and that the defendant continued to rub the shaft of his penis for five to ten minutes. He said that while this was being done, the defendant said, "Any day now." The victim stated that he ejaculated and that the defendant caught the fluid in his hand. He said the defendant went to the sink, washed his hands, and wiped the victim's penis with a gauze pad, which was thrown into a trash can.

The victim testified that the defendant never said why he did what he did and never indicated that the victim had any problem or that any type of sample was needed. The victim stated that the defendant rubbed his penis for a couple of minutes more. Then, the victim received another injection and was told to stay on his diet, keep working out, and return the next week.

The victim said that after he got home, he called Jean Kelly, who works with his mother and is a friend of his, because he did not feel comfortable about what had happened and wanted to know if the defendant's conduct was proper. Ms. Kelly replied that it was not and then he talked to his parents to tell them what happened. After a karate class that evening, the victim met with the police and went to a hospital for examination. He said that he gave the police urine samples on February 13 and March 7, 1990.

The victim testified that the defendant never billed him for any visit and never mentioned payment. He said he never returned to the defendant's office. However, he stated that, one day, he telephoned the defendant from the police department in the presence of his father and Detective Jim Vaughn, who unsuccessfully attempted to record the conversation. The victim testified that he asked why the defendant had masturbated him and that the defendant said it was to check his white count. He said he asked about the result and that the defendant replied that nothing significant was shown. He said that he believed that the defendant indicated that he was out of testosterone. He said he told the defendant that the police had been by wanting to talk to the victim and

that the defendant asked about what they wanted. The victim testified that later one evening, the defendant followed him to and from karate class. He reported this event to the police.

The victim testified that he gained twenty to thirty pounds after the injections and that he had mood swings and nightmares. He admitted using steroids later in 1990 and possessing steroids while in college.

The victim was subjected to a full and detailed cross-examination. He acknowledged that after his talk with the hospital pharmacist, he believed that his getting steroids from the defendant was illegal, but he went back for more injections. He indicated that even though he was capable of stopping the defendant from fondling him, he did not because he wanted steroids. Also, he acknowledged that he was embarrassed and thought that what the defendant did on January 17 was not right, but he returned for the last two visits because he wanted steroids.

The cross-examination revealed various discrepancies between previous statements given by the victim and his testimony. It showed that his weight in 1989 was within several pounds of his 1990 weight. He indicated that he probably would have lied to his parents about taking steroids, if they had confronted him. Also, it involved times when the victim could not recall certain events, such as, his January 31 complaints about fatigue and the defendant's nurse sticking his finger to check his blood sugar or the defendant telling him in the police station telephone conversation to tell the police the truth. Finally, the victim acknowledged that on the January 31 visit, he was not in a position to see if the defendant put the semen into a test tube.

Jean Kelly testified that she is a medical technologist and a friend of the victim's family. She said that she received a telephone call from the victim on January 31 and he seemed upset and disturbed. He told her that the defendant had him disrobe, gave him a checkup, and then fondled his genital area until he ejaculated into the defendant's hand. Ms. Kelly said that she told him that if what he was saying was true, he had "a heck of a

lawsuit." Also, she told him to tell his parents.

The defendant's mother testified that she is a medical technologist. She said that she was unaware that her son had seen the defendant until he talked to her at home on January 31. She stated that the victim told her that the defendant had sexually molested him by masturbating him. She said the victim was very nervous and upset when he was telling her what happened. She said that the victim had telephoned her husband, the victim's father, at work before he talked to her. At one point, she stated that her talk with her son occurred around 4:00 or 4:30 p.m., but later in her testimony she mentioned 5:00 and between 6:00 and 6:30 p.m.

The victim's mother testified that he had "horrible, horrible nightmares," "crawls on the floor through the house," and "punches the wall because he sees [the defendant] up against it." She said that the victim told her that the defendant told him that the defendant would kill his parents because the victim had told. After objection, the state asserted that it wanted her to testify about the changes she had seen in the victim. The trial court instructed the jury that it was not proper for the victim's mother to testify about what the victim saw or had not seen. It stated that the witness' statements about the nightmares were sufficient.

The victim's mother stated that she believed that he went to work out after leaving the defendant's office on January 31. She believed that he called Ms. Kelly and his father before he discussed the matter with her.

Dr. Richard Feldman, a physician in family practice, testified about procedures used in performing a physical examination, particularly of a male's genital area. Checking for possible hernias would be included. He stated that it was within the normal range of medical practice to obtain semen or sperm samples for medical purposes. He said that in such a situation, it is necessary that the sample be tested quickly before the sperm dies. He stated that he did not believe that it was normal medical practice for a doctor performing a physical examination to masturbate the patient or to rub the penis of the patient until an erection was obtained. Also, he did not believe it was within normal medical practice for a doctor to obtain a sample by masturbating the patient. He asserted that obtaining a patient's blood was the way to check white and red cells.

John Taylor, a Tennessee Bureau of Investigation Agent, testified that he assisted the Hendersonville Police Department in the execution of a search warrant at the defendant's office in February, 1990. Through him, a booklet titled *The Art of Marathon Masturbation* was admitted into evidence. Mr. Taylor stated that he found the booklet in the lower right side of a credenza behind the defendant's desk. He said that it depicted "numerous sexually explicit pictures of men engaged in masturbation."

Don Linzy, a Hendersonville Police Detective, testified that on February 7, 1990, pursuant to a search warrant, he found a videotape on the floorboard of the defendant's van. Detective Jim Vaughn later testified that the tape depicted sexually explicit activity between men.

Detective Vaughn testified about his obtaining a statement from the victim and conducting an investigation. On the night of January 31, 1990, he went through the contents of a dumpster behind the defendant's office. He found the sign-in sheet which the victim had signed that day, gauze pads which fit the description given by the victim, and a vial which contained a white substance. He sent the vial and gauze pads to the T.B.I. Crime Laboratory for identification.

Detective Vaughn testified that on February 7, 1990, he arranged for the victim to place a telephone call to the defendant, which he unsuccessfully attempted to record. He said that the victim asked the defendant why some of the boys at school were calling him queer and that the defendant replied that he had not told anyone what he had done. He said that the defendant told the victim that the semen sample was tested for possible prostate infection, but none was found.

That same day, Detective Vaughn was involved in a search of the defendant's office and questioned the defendant. The defendant told him that the victim had wanted to

be bigger and faster and wanted injections of testosterone. Detective Vaughn took notes of the interview. The defendant stated that, instead, he gave the victim injections containing vitamins. The defendant acknowledged that the victim had an erection during his examinations and stated that the victim had a spontaneous ejaculation. He said that part of the ejaculation specimen was caught and he checked it for white blood count. He denied masturbating the victim and said the allegation was possibly a fantasy of the victim.

Detective Vaughn testified that the defendant identified two men who lived with him, stating that he believed them to be heterosexual. However, the defendant also said that it was possible that the two men were bisexual. Detective Vaughn testified that he assisted in an execution of a search warrant at the defendant's home. He stated that videotapes were seized from a recreation room and the master bedroom closet. He stated that fifteen videotapes were sexually explicit and that all but two involved acts between men.

On cross-examination, Detective Vaughn acknowledged that his notes to the telephone conversation between the defendant and the victim reflected that the defendant told the victim to "tell the facts" and did not ask him to lie or hide anything. Also, he stated that during his interview with the defendant, the defendant asked to be provided with a typed copy of his statement and said that he would sign it after he reviewed it for accuracy. Detective Vaughn acknowledged that he never furnished the defendant with a copy of such a statement.

Detective Vaughn acknowledged that a vial with remnants of vitamin B12 was found in the defendant's office trash. The defendant had stated that he had given the victim a vitamin B complex injection.

Detective Vaughn stated that he received word from the victim that the defendant had followed him to his karate class in Mt. Juliet on March 27, 1990. The proof indicated that the victim's claim related to a period of time from 6:30 p.m. until 10:00 p.m. Detective Vaughn stated that he never attempted to verify if the defendant had actually followed the victim, but assumed the victim's account was true.

Bonnie Gatlin testified that she is a licensed practical nurse who was employed by the defendant from 1980 until 1990. She stated that on January 29, 1990, she placed an order for medicines for the defendant which included testosterone. She said that she placed orders for steroids on a few previous occasions.

On cross-examination, Ms. Gatlin testified that she remembered seeing the victim in the defendant's office. She said that she or the other nurse checked his weight on each visit and made note of it on the records. Also, she said that she did a glucose test on the victim at the defendant's request when the victim complained of fatigue.

Ms. Gatlin stated that one of the nurses usually stayed at the office until all of the patients were gone. She said that the defendant had been the team doctor for some school football teams and that he, typically, did not bill student athletes. She said that he did not bill some of his older patients or indigent patients, as well.

Patsy Choatie, a forensic scientist with the T.B.I. Crime Laboratory, testified that she tested the gauze pads, the glass tube with some liquid, and the blood and saliva samples from the victim. She determined that the liquid in the glass tube was semen which could have come from the victim, but was consistent with twenty-three percent of the population. She said that she found a few spermatozoa on one of the gauze pads, but not enough to perform a conclusive test.

Dr. David L. Black, a forensic toxicologist and president and laboratory director of Aegis Analytical Laboratories, testified that he examined the two urine specimens which were received from the Hendersonville Police Department on February 13 and March 7, 1990. He was seeking to determine the presence of anabolic androgenic steroids. The examination of the February 13 sample revealed that the testosterone level was higher than in most normal males, although it was not high enough to be identified as a positive sample under the guidelines of the International Olympic Committee. The ex-

amination of the March 7 sample revealed a lower level of testosterone than the earlier sample. Dr. Black concluded from his results that at some time before the first urine sample was given, testosterone had been administered.

Dr. Black testified that after the testing, the two samples were inadvertently placed in the refrigerator, where they remained. He acknowledged that they should have been placed in a freezer for long-term storage and that because they had not been properly stored, it was not possible to perform any additional tests on the samples. Also, Dr. Black stated that he did not do a full scan of the testosterone in the two samples, but he asserted that the partial scan he did was fully acceptable.

The defense presented hospital medical records which reflected that the defendant was at Hendersonville Hospital on March 27, 1990, at 6:30 p.m. and at Nashville Memorial Hospital on March 27, beginning at 6:49 p.m., and with patients at the hospital at 8:00 p.m. Jessie Henderson, a nurse, testified that she was working for the defendant in January, 1990, and that she was his office manager. She stated that the defendant frequently did not bill elderly patients and never billed male and female student athletes. She said that testosterone was one of the drugs that was normally kept in the office and that it was only necessary to order it every six or eight months because it was not used a lot. On cross-examination, Ms. Henderson acknowledged that there was nothing written on the victim's medical records to indicate that he had received any injection, had obtained any erection or had ejaculated during an office visit, or that a semen sample had been taken.

Dr. Don Catlin testified that he is a physician at U.C.L.A. and is an associate professor of medicine, associate professor of pharmacology, director of the U.C.L.A. laboratory and chief of the division of pharmacology. He described how the presence of chemical testosterone in the body is determined and evaluated. He stated that such things as diet, other drugs, or the consumption of alcohol could alter the applicable ratio used for evaluation purposes. He testified that he received the two urine samples taken from

the victim, but could not perform any tests on the first sample because it had been contaminated. However, the test results on the second sample were similar to those obtained by Dr. Black.

## SUFFICIENCY OF THE EVIDENCE

■ When the sufficiency of the evidence is questioned on appeal, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. *See State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn.1984); *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

The defendant contends that the state failed to prove that fraud was used to accomplish sexual contact. The offense of sexual battery would be committed by unlawful sexual contact with a victim by the defendant which is accomplished by fraud. T.C.A. §§ 39–13–503(a)(3) and –505(a). In T.C.A. § 39–11–106(a)(13), fraud is "defined as the term is used in normal parlance and includes, but is not limited to, deceit, trickery, misrepresentation and subterfuge, and shall be broadly construed to accomplish the purposes of this title...."

The defendant asserts that an implicit requirement for an offense such as rape or sexual battery of a victim over the age of thirteen is that the act be committed without the consent of the victim. *See State v. Wilkins,* 655 S.W.2d 914, 916 (Tenn.1983) (common law requirement of act being without the consent of or against the will of the victim has been adopted by statute worded similarly to the present statute); Tenn. R.Evid. 412(c)(3) and (4)(iii) (victim's sexual behavior admissible if relevant to issue of consent). He states that the victim was completely aware of what was happening and indicated a belief that the defendant's conduct was improper, but returned to obtain

steroids while allowing the defendant to commit the act upon which the convictions are based. He argues that there could be no fraud as a matter of law.

His argument is partly based upon his separating fraud into two concepts, fraud in the inducement and fraud in the fact, and his claim that fraud in the fact is the only type which would preclude the victim from giving effective consent to the defendant's acts. He relies upon the following observation by Professor Wayne R. LaFave:

As to assent by deception, the distinction which has traditionally been drawn is between fraud in the factum and fraud in the inducement. Fraud in the factum involves a form of deception which results in a misunderstanding by the victim as to the very fact of the defendant's conduct, while fraud in the inducement merely involves deception as to some collateral matter; the former cannot result in effective assent, but the latter can. For example, if a doctor engages in sexual intercourse with a female patient under circumstances in which she does not know what is occurring and believes that she is only submitting to an examination or operation, this is fraud in the factum and the woman cannot be said to have consented. On the other hand, if the doctor convinces the woman that she should submit to intercourse because this would be effective treatment for her illness, the woman has given effective consent because this is only fraud in the inducement.

Wayne R. LaFave, *Substantive Criminal Law* § 5.11, at 689–690 (W.1986) (footnotes omitted).

Also in support, the defendant cites *Boro v. Superior Court,* 163 Cal.App.3d 1224, 210 Cal.Rptr. 122 (1985), which dealt with a victim having sexual intercourse with the defendant upon the defendant's misrepresentation that it was necessary to cure a disease he claimed that the victim had. The concern was whether a rape occurred under a statute prohibiting sexual intercourse when the victim "is at the time unconscious of the nature of the act, and this is known to the accused." The prosecutor's position was that the victim was unconscious of the nature of the act

because the defendant's misrepresentations led her to believe that the conduct was in the nature of medical treatment, not an ordinary act of sexual intercourse. The court disagreed because of its view of the distinction between fraud in the inducement and fraud in the fact as those concepts related to consent.

Thus, as a leading authority has written, "if deception causes a misunderstanding as to the fact itself (fraud in the factum) there is no legally-recognized consent because what happened is not that for which consent was given; whereas consent induced by fraud is as effective as any other consent, so far as direct and immediate legal consequences are concerned, if the deception relates not to thing done but merely to some collateral matter (fraud in the inducement)." (*Perkins & Boyce,* Criminal Law (3d ed. 1982) ch. 9, § 3, P. 1079.) 163 Cal.App.3d at 1227, 210 Cal.Rptr. at 124. It cited as an example of fraud in the fact the case of *People v. Minkowski,* 204 Cal.App.2d 832, 23 Cal.Rptr. 92 (1962), in which a physician was convicted for rapes where the victims believed that he was inserting only medical instruments for examination purposes. However, it considered the case before it to involve a victim who was aware of the carnal act to be performed and it concluded that rape under the statute in issue did not occur.

The defendant in the present case asserts that the victim knew what was occurring and consented to it. In response, the state contends that the definition of fraud in Tennessee is not limited to any particular type of fraud. It asserts that fraud comprises "anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, resulting in damage to another, or by which an undue and unconscientious advantage is taken of another." 37 Am.Jur.2d, *Fraud and Deceit,* § 1 at 19; *see New York Life Insurance Company v. Nashville Trust Company,* 200 Tenn. 513, 292 S.W.2d 749, 754 (1956); *Smith v. Harrison,* 49 Tenn. 230, 242 (1870).

We conclude that the authorities cited by the defendant are not persuasive in the context of Tennessee law and that the view of

fraud which the state asserts is the one contemplated by the legislature in its statutory definition of fraud and its criminalizing sexual contact accomplished by fraud. In *Boro*, the California statute related to the victim being "unconscious of the nature of the act." We can understand how fraud in the inducement would not make a victim unaware of the act being performed, but the statutes we are reviewing do not limit the victim to a state of unawareness. Also, the sole case, *Moran v. People*, 25 Mich. 356 (1872), cited by Professor LaFave in support of his statement that fraud in the inducement by a physician does not negate a victim's "effective consent" to sexual intercourse actually infers the contrary to his proposition.

In *Moran*, the court was reviewing a rape case in which the jury was instructed that carnal knowledge resulting from fraudulent misrepresentation that medical treatment required sexual intercourse, without which the victim would not have consented to the act, constituted rape. Rape was defined by statute as unlawful carnal knowledge, by force and against the victim's will. The conviction was reversed upon the court's specific holding that fraud did not constitute force. As importantly, the court's analysis indicates that it would have had little problem, aside from force being required, in concluding that a fraudulently procured consent as shown in the case of misrepresented medical treatment would be no consent at all. 25 Mich. at 364–65.

In *Wyatt v. State*, 32 Tenn. 394 (1852), our supreme court was reviewing a jury instruction that "fraudulently inducing the prosecutor's wife to believe that it was her husband and thereby to have carnal knowledge of her" would constitute an assault with intent to commit rape under a statute defining rape as "unlawful carnal knowledge of a woman, forcibly, and against her will," a statute similar to that reviewed in *Moran*. The court reversed the conviction, stating:

> The current of authority is almost, if not entirely, unbroken on the subject. There is no respectable conflicting authority known to us. Fraud and stratagem, then, cannot be substituted for force, as an ele-

ment of this offence, according to the existing law.

32 Tenn. at 398–99. In *Bloodworth v. State*, 65 Tenn. 614 (1872), the supreme court was confronted with the use of a mock marriage to induce a woman of "very weak mind" to believe that she was married which resulted in her having sexual intercourse with her "husband." In reversing the conviction of an aider and abettor, the court relied upon *Wyatt* in holding that fraud and deceit do not show force. It considered the principle decided in *Wyatt* to be conclusive,

> for in case of fraud, where a woman yields to sexual intercourse with a man supposing him to be her husband, and is thus outraged in fact by fraud, she gives no intelligent assent to what is done, and she as much withholds her assent to the act done, if the case was apprehended by her, as the imbecile, and even would revolt from it; yet in such a case, under the rule laid down, there would be no rape.

65 Tenn. at 620.

We believe that the presently existing statutes cure the ills perceived in *Wyatt* and *Bloodworth* by providing fraud, in its broad meaning, as an alternative element to force or coercion for the purposes of rape and sexual battery. Also, we are mindful that the legislature, for the purposes of our criminal code, has provided that consent is not effective when it is induced by deception. T.C.A. § 39–11–106(a)(9)(A).

In the light most favorable to the state, the evidence in this case shows that the defendant used his position as a treating physician with the intent to touch the victim's genitals solely for his sexual arousal or gratification, not for medical purposes, and that the touching was accomplished under the guise of medical examination and treatment for the purpose of having the victim allow such touching. Likewise, the evidence shows that the victim reasonably believed that the touching was for medical purposes and relied upon such guise in allowing the contact.

A licensed physician who holds him or herself out to the public as one available to administer to the medical needs of patients through examination and treatment is bur-

dened with the duty to act for medical purposes in dealing with patients seeking medical care. There is an inherent trust and confidence which a patient seeking medical care places in the physician and upon which a patient relies in allowing the physician access to the most intimate parts of the body.

In this respect, if the physician intends to gain access for nonmedical purposes, uses his position as a treating physician for such purpose, and the patient allows such access because of a belief that it is for medical purposes, we have no problem in concluding that the physician perpetrates a fraud upon the patient as defined in T.C.A. § 39–11–106(a)(13). It is a misrepresentation of the physician's then existing intent which breaches the physician's duty to the patient. Further, when the physician's intended act is the touching of the patient's genitals for the purpose of sexual arousal or gratification, we have no problem in concluding that the sexual contact is unlawful and accomplished by fraud so as to constitute the offense of sexual battery. *See State v. Thomas D. Remsen,* No. 01C01–9204–CR–00122, Davidson Co., slip op. at 7, 1993 WL 31988 (Tenn.Crim.App. Feb. 11, 1993). Thus, in this case, the victim's reasonable reliance upon a belief that the defendant's touching was for medical purposes and his thereby allowing the touching would not constitute such a consent that would make the contact lawful so as to preclude a sexual battery conviction. The evidence was sufficient to convict.

## SEXUALLY EXPLICIT EVIDENCE

The defendant states that the issue of primary concern deals with the admission into evidence of, and prosecution argument about, videotapes and a booklet found in the defendant's possession which depicted sexually explicit acts by and between males and of the defendant's statement that his roommates were possibly bisexual. In a jury-out hearing, the defendant sought to exclude the tapes and booklet from the evidence as irrelevant and prejudicially inflammatory. The trial court excluded the contents of the items from the jury's view, but allowed the testimony about the nature of their contents. It stated that the evidence was allowed "to show any proclivity of the Defendant to commit the offense for which he is charged." Also, the trial court allowed into evidence the defendant's statement that his roommates were possibly bisexual, although it did not indicate any specific reason for its admission other than it was a statement made by the defendant. We note that none of this evidence was shown to be directly connected to the events involving the victim, such as, the defendant displaying the items to the victim.

The defendant contends that the evidence was inadmissible under Rule 404, Tenn. R.Evid., which provides, in part:

(a) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, except:

(1) *Character of Accused.* Evidence of a pertinent character offered by the accused or by the prosecution to rebut the same.

\* \* \* \* \* \*

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes.

He notes that proclivity means nothing more than propensity and that Rule 404 directly prohibits the use of evidence to show a propensity to act. *See State v. Parton,* 694 S.W.2d 299, 302 (Tenn.1985) (evidence of another crime inadmissible to show the mere fact that defendant is the kind of person who would tend to commit the offense); Neil P. Cohen et al., *Tennessee Law of Evidence,* § 404.2, at 125 (2d ed. 1990) ("character evidence cannot be used to prove that a person did a certain act because the person had a propensity to commit it.")

The state implicitly concedes the inadmissibility of propensity evidence, characterizing the trial court's "proclivity" statement as an "unfortunate mischaracterization." However, it contends that the evidence was admissible because it was probative on the issue of the defendant's intent. *See* Cohen, *supra,* § 404.9, at 135 (when specific criminal intent must be shown, evidence of other crimes or

acts may be admitted to show the requisite intent for the offense charged); *see, e.g., Rafferty v. State,* 91 Tenn. 655, 16 S.W. 728, 730 (1891) (issue of intent to defraud insurance company by fire loss claim for items not in house made admissible evidence that defendant had same items destroyed in thirteen previous fires covered by insurance). It asserts that the trial court correctly concluded that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* Tenn.R.Evid. 403.

In the trial court, the defendant expressed his concern that the state was seeking to have the jury infer from the evidence that the defendant was a homosexual, infer that he would participate in homosexual acts, and then infer from those inferences that he intended to commit a sexual battery upon the victim. In many ways, this is the equivalent of the state contending that the defendant's possession of heterosexually explicit videotapes and a book regarding female masturbation would tend to prove that the defendant committed a sexual battery upon a female patient. A potential distinction between the two might be recognized in a few jurisdictions based upon their view that aberrant sexual conduct would include homosexual acts and that certain crimes stem "from a specific emotional propensity for sexual aberration." *State v. McDaniel,* 80 Ariz. 381, 298 P.2d 798, 802 (1956). Even they, though, appear to limit the evidence to previous acts by the defendant similar to the one on trial. In any event, Tennessee has refused to adopt a sex crime or acts exception to the rule of exclusion provided by Rule 404 and case law for evidence of previous crimes or bad acts. *See State v. Rickman,* 876 S.W.2d 824, 829 (Tenn.1994).

We believe that the evidence was not rationally related to the issue of the defendant's criminal intent and should have been excluded. As a starting point, we recognize that sexual battery accomplished by fraud actually entails two mental states, relative to deceiving the victim for the purpose of allowing sexual contact and to being sexually aroused or gratified by touching the victim's intimate parts. *See* T.C.A. §§ 39–11–106(a)(13), 39–13–501(6). The question then

becomes what relevance does the defendant's possession of a booklet depicting male masturbation and videotapes depicting sexual acts between men and his statement that his roommates are possibly bisexual have to show that he intended to have sexual contact with the victim or intended to deceive the victim into allowing such contact, or intended to do both. If any probative value on the issue of intent exists other than through showing propensity, then the inquiry is whether that value is outweighed by the danger of unfair prejudice. Tenn.R.Evid. 404(b)(3). The state's reliance upon the weighing standard in Rule 403 is misplaced.

The evidence of the defendant's possession of the items in question and his living with possible bisexuals could, by inference, tend to make the fact that the defendant is a homosexual more probable than it would be without such evidence. *See* Tenn.R.Evid. 401 (defining relevant evidence). However, the hurdle lies in attempting to translate this into further legitimate inferences which are sufficiently relevant to an intent to commit a sexual battery upon the victim. We believe the hurdle is insurmountable. That is, to the extent that the ultimate inference sought to be drawn by the state, i.e., the defendant's intent to commit a sexual battery upon the victim, must be derived from initial inferences about the defendant's character traits circumstantially drawn from the questioned evidence, such evidence's probative value on the ultimate inference is greatly attenuated.

Homosexuality is a sexual orientation to persons of the same sex. Propensity denotes a natural inclination, tendency, or a preference for or a predilection in favor of something. *See American Heritage Dictionary,* 663 (3d ed. 1994). One can conclude from the fact that a person is a homosexual that he or she has a natural sexual inclination or preference for other persons of the same sex. In this respect, propensity can bear generally upon the person's general state of mind. However, as previously noted, we do not tolerate the use of evidence merely showing a propensity or character trait in order to prove that an accused acted in conformity with the propensity or trait so as to commit a given offense or possessed the particular

criminal intent which is required for that offense. Because we view the general inference of homosexuality to relate to propensity as used in this case, we conclude that the trial court erred by admitting into evidence the booklet, videotapes and the defendant's statement regarding his roommates.

Relative to harm, we conclude that there was a substantial risk that the jury relied upon the questioned evidence and decided the issue of the defendant's guilt based partly upon the defendant's propensity or character trait inferentially proven regarding homosexuality. We note that the state argued the following to the jury:

> There was a proverb, ladies and gentlemen, "As a man thinketh, so is he." As a man thinketh, the art of marathon masturbation, so is he. As a man thinketh, in the back of his car a sexually explicit video depicting sexual acts of men, so is he. As a man thinketh, videos of sexually explicit acts between men in the recreation room and the master bedroom, so is he.

Other portions of the state's argument focused upon the defendant's possession of the booklet and the videotapes in his office, vehicle and home at the time that he was with the nude victim in the examining room. Also, the state speculated about what was to happen after the last visit, querying if the victim was "to be living out there with Dr. Tizard at his house where those movies are." In other words, the state made substantial use of the evidence.

On the other hand, the defendant strongly assailed the accuracy of the victim's account, the truth of various statements he made, and his motivations about and level of awareness during the events in issue. The defendant's denial of wrongdoing and explanation of the circumstances were before the jury by means of the statement introduced by the state.

Absent the questioned evidence, the proof was far from overwhelming regarding what occurred and the defendant's intent during the events. Under these circumstances, we hold that the erroneous admission of such evidence more probably than not affected the verdict. *See* T.R.A.P. 36(b).[1] Reversible error occurred.

## CROSS–EXAMINATION OF VICTIM

The defendant contends that the trial court improperly refused to allow him to question the victim about his use of steroids before he ever went to see the defendant. He argues that the cross-examination was for the purpose of impeaching the victim because the state had proved through direct examination that the defendant was the first person to suggest steroids to the victim.

■ As the defendant asserts, great latitude is allowed in cross-examination. *See State v. Horne*, 652 S.W.2d 916, 918 (Tenn. Crim.App.1983). Yet, we disagree with his view of what occurred during the victim's testimony. The substance of the victim's position was that he wanted to take steroids, asked other individuals about steroids, and first mentioned steroids when talking with the defendant. Granted, at one point, the victim indicated that the defendant was the first person to suggest steroids, but this singular indication is belied by the remainder of his testimony.

■ However, we do note that the victim denied using steroids before his involvement with the defendant. The prohibited questioning about which the defendant complains related to a contention that another student accused the victim in early January, 1990, of being on steroids and that the victim denied being on steroids, slamming the student

---

1. The defendant submitted an affidavit from a juror to the effect that the juror would not have found the defendant guilty without the admission of the videotapes into evidence. The defendant contends that the affidavit shows the prejudicial impact of the questioned evidence. However, as the state points out, Rule 606(b), Tenn.R.Evid., prohibits, relative to inquiry into the validity of a verdict, the use of juror testimony or affidavits regarding "the effect of anything upon any juror's mind or emotion as influencing that juror to assent to or dissent from the verdict," except for questions regarding extraneous prejudicial information brought to the jury's attention, outside influence improperly brought to bear upon a juror, or the existence of a quotient verdict. The issue of whether or not the erroneous admission of evidence at a trial is harmless error directly relates to the validity of a verdict. We view Rule 606(b) to preclude our consideration of the juror affidavit.

against a locker. The trial court concluded that the purported incident was irrelevant. We agree and fail to see how another student's accusation and the victim's response to the accusation impeaches the victim regarding his denial of previous steroid use.

## FRESH COMPLAINT TESTIMONY

The defendant contends that the trial court erred in allowing Jean Kelly and the victim's mother to testify about what the victim told them had happened in the defendant's office. The trial court allowed the testimony as evidence of the victim's fresh complaint about the defendant's conduct and noted that the victim's credibility had been seriously attacked during cross-examination.

The defendant states that evidence of fresh complaint is admissible to corroborate a victim's in-court testimony only if the victim's credibility has been attacked, such as, by contending the victim was motivated to slant or fabricate testimony. *See* Cohen, *supra*, § 803(2).6, at 67 (Supp.1991). He contends that there was no such attack. Also, he argues that even if Ms. Kelly's testimony constitutes proper proof of fresh complaint, the victim's mother should not have been allowed to testify about what the victim told her. The defendant reasons that the fresh complaint doctrine should not be a vehicle through which a parade of witnesses is allowed to testify about a victim's out-of-court statements.

 Ordinarily, prior consistent statements of a witness are not admissible to bolster the witness' credibility. *State v. Braggs,* 604 S.W.2d 883, 885 (Tenn.Crim.App. 1980). There are exceptions, though, which relate to particular attacks upon credibility. For instance, if an opponent attempts to show that the witness was motivated to lie or slant testimony, we allow evidence of the witness' previous statement made before the motive to lie arose which is consistent with the in-court testimony. *See Sutton v. State,* 155 Tenn. 200, 291 S.W. 1069, 1069–70 (1927). Also, impeachment by use of a prior inconsistent statement will allow for introduction of a

consistent statement made before the inconsistent one. *Graham v. McReynolds,* 90 Tenn. 673, 18 S.W. 272, 277–78 (1891). Likewise, if the witness is impeached by suggestion of faulty recollection, it would be relevant to prove that the witness made a consistent statement soon after the event when the matter was fresher in the witness' memory. *See United States v. Coleman,* 631 F.2d 908, 914 (D.C.Cir.1980); *United States v. Keller,* 145 F.Supp. 692, 697 (D.N.J.1956). The fresh complaint doctrine is somewhat akin to these exceptions regarding prior consistent statements.

 The fresh complaint doctrine, as applied in Tennessee, provides that a victim's complaint of rape or sexual assault, including the details, made to another person soon after the event is admissible in the state's case-in-chief to corroborate the victim's in-court testimony about the event in terms of supporting his or her credibility in that testimony. *See King v. State,* 210 Tenn. 150, 357 S.W.2d 42, 45–46 (1962). In essence, such evidence is admissible to repel any inference that because the victim did not complain, no outrage had in fact occurred and to corroborate the victim's in-court testimony in anticipation of an impeaching attack against the truth or the accuracy of that testimony. *See Phillips v. State,* 28 Tenn. 246, 251 (1848). Thus, contrary to the defendant's assertions, the fresh complaint doctrine in Tennessee has not, to date, limited admissibility of evidence of a complaint, and its details, until after an attack on credibility has occurred.*

 However, aside from the fresh complaint doctrine, we believe that sufficient reason to admit the victim's prior statements existed because of the defendant's strong attack on the victim's credibility, particularly regarding his honesty and the accuracy of his account. The fact that the attack occurred only through vigorous cross-examination of the victim was sufficient to allow the state to answer the attack in its case-in-chief by admission of the prior consistent statements. *See Sutton v. State,* 291 S.W. at 1070.

---

* [NOTE: In *State v. Kendricks,* 891 S.W.2d 597 (Tenn.1994), decided after this case, the fresh complaint doctrine in adult victim cases was limited to allowing the fact of complaint, not the details, into evidence.]

■ As for the defendant's complaint that the victim's mother, as a second witness, should not have been allowed to testify about the victim's statements of the events, we agree with his concern about the use of a series of witnesses to prove a series of prior consistent statements by a witness. Indeed, a primary reason why prior consistent statements are ordinarily inadmissible to bolster a witness' credibility is that, without the prohibition, a party could use a parade of witnesses who heard the witness say something similar, resulting in the jury being influenced to decide the case on the repetitive nature of or the contents of the out-of-court statements instead of on the in-court, under-oath testimony. *See Curtis v. State*, 167 Tenn. 430, 70 S.W.2d 364, 366 (1934); Cohen, *supra*, § 608.11. Thus, trial courts should be mindful of the need to limit credibility bolstering evidence to that which they, in their discretion, determine will not be unduly prejudicial to the opponent of such evidence.

■ On direct examination, Ms. Kelly testified about the victim's detailed statements to her. The defendant did not attack her honesty or the accuracy of her account nor did he otherwise attempt to refute her testimony about what the victim told her. Thus, the victim's mother's testimony could be viewed to a certain extent as unnecessarily cumulative. However, we do not believe that it was an abuse of discretion under the circumstances of this case to allow her testimony. It is significant that she only testified about the victim telling her that he had been sexually molested by the defendant masturbating him and did not present any details provided to her by the victim. The victim testified that he told Ms. Kelly what happened and, then, told his parents. Ms. Kelly testified that after the victim told her what happened, she told him to tell his parents. Given this evidence, the victim's mother's testimony about the fact of his complaint on the evening of his last visit to the defendant was not so prejudicial as to require its exclusion.

## VICTIM'S EMOTIONAL CHANGES

The defendant contends that the victim's mother's testimony about the victim having "horrible, horrible nightmares," after January, 1990, was improper because it was irrelevant and unduly engendered sympathy for the victim. *See, e.g., State v. Alley*, 776 S.W.2d 506, 512 (Tenn.1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 775 (1990) (improper to show effect of crime upon victim's family); *State v. Hensley*, 656 S.W.2d 410, 414 (Tenn.Crim.App.1983) (should not use evidence designed to raise sympathy for victim and his family). Although the state responds that the evidence did not relate to the effect of the crime on the victim's family, it does not specify the purpose for which the evidence was introduced.

In any event, we do not believe that the record shows that the defendant objected to the nightmare evidence. The state asked the victim's mother what changes she had seen in the victim during January, 1990. She answered without defense objection. Then, the state asked her about changes occurring after January and she answered relative to the victim's nightmares, crawling on the floor through the house, punching the wall because he sees the defendant up against it, being very upset and telling her that the defendant said that he would kill the victim's parents because the victim told what happened. It was only at this point that the defendant objected, without further specification about what evidence he considered objectionable.

■ The court instructed the jury not to consider what the victim told his mother, advising the state that it had gone too far. When the state asserted its desire to elicit further testimony about changes the witness had seen in the victim, the trial court stated that the testimony about the nightmares was sufficient. The record does not indicate that the defendant made known to the trial court any disagreement with its ruling. The failing of a party to take reasonable action to prevent or nullify the harmful effect of an error may constitute a waiver or negate an entitlement to relief. T.R.A.P. 36(a). Thus, we conclude that the defendant has not shown himself entitled to appellate relief for this claimed error.

## EXPERT AND SCIENTIFIC EVIDENCE

■ The defendant contends that Dr. Feldman's testimony about what was proper medical procedure in conducting physical examinations was irrelevant. He makes a similar claim regarding Dr. Black's testimony about the victim's steroid test results. The decision whether to admit or exclude expert testimony and scientific evidence rests within the discretion of the trial court and relief on appeal will only be afforded if there was an abuse of discretion which was prejudicial. *See State v. Schimpf,* 782 S.W.2d 186, 191 (Tenn.Crim.App.1989).

■ As previously discussed, the state's claim in this case was that the defendant took advantage of the victim by the guise of giving him physical examinations. Evidence of proper medical procedure as established by medical professionals was relevant because it tended to show that the touching upon which the charges were based was not accomplished for medical purposes. Therefore, Dr. Feldman's testimony was admissible.

As to Dr. Black's testimony about steroids in the victim's body, the trial court stated that it would primarily allow the evidence on the issue of credibility because the defendant had "brought up" the contention that he gave the victim vitamins, not steroids. Also, it indicated that it agreed with the state's claim that the testimony was relevant because of steroids being the lure and the reason why the victim went to the defendant. The defendant correctly notes that the state, not he, introduced his statement to the police which contained the vitamin claim. He asserts that it was improper for the state to introduce his statement and then to impeach that statement by introducing other evidence. In response, the state contends that it was the victim's credibility to which the trial court was referring, not the defendant's. It notes the defendant's vigorous attack upon the victim's credibility and his reliance upon the vitamin claim in order to prove that the victim was lying, including in his claim that he got steroid injections from the defendant.

At the time of Dr. Black's testimony, the jury had already heard the victim's testimony about receiving steroids, the defendant's cross-examination of the victim about steroids, Detective Vaughn's account of the defendant denying giving the victim steroids, and the defendant's cross-examination of Detective Vaughn eliciting the fact that a vial with remnants of vitamins was found in the defendant's office trash on the date of the victim's last visit. Regardless of which party introduced a particular piece of evidence, it is apparent that each side was presenting a position about whether or not steroids were actually given. From the state's perspective, as the trial court recognized, evidence about steroids was inextricably entwined with the evidence directly relating to the offenses charged. From its proof, it was the reason why the victim went to the defendant and continued returning to him. Also, the state indicated that it believed that the defendant's offer of steroids without charge constituted an enticement by the defendant in order for the offenses to be accomplished.

■ From the defendant's perspective, it is significant that he did not object to the state introducing his statement to Detective Vaughn that the victim's injections only contained vitamins. When this is considered with the fact that the defendant elicited from Detective Vaughn the fact of the vitamin vial being retrieved from his office trash, it is reasonable to infer that the defendant was willing to make an issue about what was being injected into the victim. In this respect, the mere fact that the state introduced into evidence the defendant's assertion that only vitamins were administered did not foreclose the state from disproving this claim. *See, e.g.,* Tenn.R.Evid. 607 (allowing a party to impeach a witness that party called). Thus, although the issue of whether or not steroids were, in fact, administered by the defendant was collateral to the primary issues in the trial, the evidence had been developed by both parties up to the time Dr. Black testified so as to relate the steroid issue to the credibility of the victim and the defendant. The fact that the issue of the defendant's credibility arose merely from the introduction into evidence of his statement to the police is of no consequence—it is obvious that he was relying upon the truth of the matters asserted in his statement.

Also, we note that the trial court instructed the jury that it was to consider the evidence regarding steroids on the issue of credibility. Under these circumstances, we conclude that the trial court did not abuse its discretion in allowing evidence about the steroid test results.

## PUBLIC TRIAL

Finally, the defendant contends that he was denied his right to a public trial in violation of the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. The record reflects that a journalism class of about ten students entered the courtroom to observe the trial and was present during the cross-examination of the victim when references to masturbation by vulgar vernacular was occurring. The trial court stopped the questioning, determined the reason for the students' presence, then "excused" them from the courtroom. It stated, "I believe all the testimony can be more uninhibited without the presence of the young people and for other reasons, too."

The defendant contends that insufficient reason existed for this partial closure and that prejudice to him is to be presumed. He also contends that the trial court's actions were prejudicial to the judicial process so as to call for a reversal without the need for a harmless error analysis. *See* T.R.A.P. 36(b). The state replies that the trial court did not abuse its discretion in removing the students and that even if their exclusion was violative of the defendant's right to a public trial, a harmless error analysis would be required and would show that no prejudice occurred.

 In *State v. Sams*, 802 S.W.2d 635 (Tenn.Crim.App.1990), this court's opinion, authored by Judge Jones, provided an excellent history and analysis of the constitutional right to a public trial and concluded that "[p]rejudice is implied once a violation of the right to a public trial has been established," noting that to require actual proof of prejudice "would seriously impair, if not actually destroy, the safeguards provided by the public trial requirement." *Id.* at 641. Thus, contrary to the result sought by the state, if the record shows a violation of the right to a public trial, even through partial closure, we would imply such prejudice as would require a reversal.

However, we believe the issue is resolved in this case by the defendant's failures to assert his right in timely fashion and to preserve an adequate record for proper appellate review. As the state notes, the defendant did not object to the trial court's actions or otherwise make known his concern until he filed his motion for a new trial. Even then, he rested on his motion without arguing this issue.[2] In this respect, we conclude that the defendant waived his right to a public trial to the extent that the partial closure resulted in the exclusion of the students.

In consideration of the foregoing, the defendant's convictions are reversed and the case is remanded to the trial court for a new trial.

WHITE, J., concurs.

ALLEN R. CORNELIUS, Jr., Special Judge, dissents.

---

**2.** The defendant filed an affidavit from one of his trial attorneys which asserted that he did not have an opportunity to object because the jury was present, the students left as directed by the trial court, and he could not ask the students to come back without offending the trial court or the jury. Given the fact that trial counsel was a very experienced, highly competent attorney, we view the affidavit to be somewhat disingenuous. The record reflects numerous jury-out hearings and bench conferences outside the hearing of the jury. Also, it reflects that the trial court was quite solicitous in dealing with all motions, objections, and legal contentions presented by the parties. We conclude that the affidavit does not show that the defendant did not, in fact, have a reasonable opportunity to object or otherwise to obtain an appropriate remedy regarding the partial closure.