IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

MARCH 1999 SESSION

FILED

May 14, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | NO. 01C01-9802-CC-00083 |
| Appellee, | ) | |
| | ) | COFFEE COUNTY |
| VS. | ) | |
| | ) | HON. GERALD L. EWELL, SR., |
| TANIESE ANNETTE WILSON, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (First-Degree Murder) |

FOR THE APPELLANT:

FOREST A. DURARD, JR.
724 North Main St.
P.O. Box 967
Shelbyville, TN 37160-0967
(At trial and on appeal)

JEFFREY K. SECKLER
101 West Side Public Square
P. O. Box 765
Shelbyville, TN 37162
(At trial)

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

TIMOTHY F. BEHAN
Assistant Attorney General
Cordell Hull Building, 2nd Floor
425 Fifth Avenue North
Nashville, TN 37243-0493

C. MICHAEL LAYNE
District Attorney General

KENNETH SHELTON
Assistant District Attorney General
P.O. Box 147
Manchester, TN 37349-0147

OPINION FILED: _____

AFFIRMED

JOE G. RILEY,
JUDGE

**OPINION**

A Coffee County jury convicted defendant, Taniese Annette Wilson, of first-degree premeditated murder. She was sentenced to life imprisonment. On this appeal as of right, defendant raises the following issues:

1. whether the state committed prosecutorial misconduct during closing argument;

2. whether the trial court erred in admitting prior consistent statements of two witnesses;

3. whether the trial court erred in admitting the statement of a severed co-defendant; and

4. whether the evidence is sufficient to sustain her conviction.

Upon our review of the record, we AFFIRM defendant's conviction.

**FACTS**

Defendant married the victim, Alan Charles Wilson, on September 28, 1996. Defendant's son, Richard Daniel Clark, lived with them, as did Wilson's son, Christopher. Wilson was killed by two gunshot wounds to the head on October 27, 1996.

Clark was sixteen at the time of trial; he was fifteen on the date Wilson was murdered. According to Clark, defendant had a romantic relationship with Tommy Heflin while she was dating Wilson. He testified that defendant told him she had married Wilson "to divorce him and get his kid." She later asked him to kill Wilson. He agreed to do so "[b]ecause Mamma was going to buy me a new truck and we was going to move." She told him that, in addition to the insurance policy Wilson had through his employer, there was another policy that would pay $100,000, and that she would get a new house by killing Wilson.

Clark testified that he and Heflin got together on October 26, 1996, drove to Normandy Lake, parked, and waited for defendant and Wilson. Clark testified that

2

Heflin gave him a .22 semi-automatic pistol. After fifteen to twenty minutes, they saw defendant and Wilson drive by, waited another ten to fifteen minutes, and then drove to Normandy Dam. They found defendant's car parked at a loading dock. Clark and Heflin exited the car; Clark had the pistol. They found defendant sitting beside Wilson,[1] who was "[p]assed out." Clark testified that he walked up and shot Wilson twice in the head, and that Wilson never woke up. He testified that defendant was sitting three feet beside Wilson when he shot him, and that "[s]he didn't say anything."

Clark testified that after he shot Wilson, Heflin and defendant told him to take Wilson's jewelry "[t]o make it look real." He did so and gave the jewelry to Heflin. Before Heflin and Clark left, Heflin took the gun and hit defendant on the head with it. They then left, and Heflin threw the jewelry out the car window. Later, Clark testified, Heflin threw the gun into the Duck River.

Clark testified that the plan to kill Wilson at Normandy Dam was defendant's, that she wanted to be hit in the head "[t]o make it look real," and that she was going to blame the robbery and murder on "Mexicans." He also testified that he would not have killed Wilson if it had not been for his mother.

Christopher Wilson, the victim's son, testified that Heflin had slept with defendant six or seven times after the wedding, while his father was working out of town. He explained that his father and defendant argued about her sleeping with Heflin on the Friday evening before he was shot. He also testified that after the murder, defendant told him that "two Hispanic males had came out from the woods and had demanded money and jewelry, and they had shot [his] father and beat him up and hit her." He further testified that he had heard Clark say that he hated Wilson and wanted to kill him.

Earl Lentz, Wilson's supervisor, testified that Wilson's life insurance became effective on October 20, 1996, a week prior to the murder. It was a $6,000 policy,

---

[1]Apparently, defendant and Wilson were on a blanket on the ground in front of the car.

$12,000 if the death was accidental. The benefits were payable to defendant. Lentz testified that he took the claim form to defendant who seemed surprised that Wilson had this insurance.

Eddie Murray, an insurance agent, testified that he took an application from Wilson for a $50,000 life insurance policy on October 3, 1996. This policy also paid double on accidental death, and murder is considered accidental. He said that defendant called him on October 28 to see if the policy had been issued. He called the company and determined that it had been issued on October 10, 1996.

Terry Holder testified that his sister was a friend of the defendant. After defendant married Wilson, he saw defendant and Heflin at his sister's house and asked defendant why she had married Wilson. Her response was, "for the kids and the insurance money." During this same conversation "[s]he said they were going to have him killed," and there was $100,000 of insurance.

Don Massey, Wilson's co-worker, testified that defendant told him, "she was going to hire two Mexicans to kill [Wilson]." He testified that she told him that she and Wilson would be at the lake on a blanket in front of her car. Then, "two Mexicans were supposed to come out and shoot him and put a bump on her head and rob them." He further testified that she told him about two insurance policies she was to get, as well as social security benefits for herself and Wilson's son. He also testified that she asked him if he knew of anyone who would kill Wilson. After the murder, she told him that Heflin had shot him. He also testified that she told him it had been "her plan."

Sherry Ghea, one of defendant's cellmates after the murder, testified that defendant's first story about the murder was that "the Mexicans had come up and had knocked her out and when she woke up, [Wilson] was dead." Later, Ghea testified, defendant told her that she heard Heflin was going to testify against her, and her explanation of the murder changed:

> She told me that her and [Wilson] had been out to the lake, and that [Clark] and [Heflin] had pulled up in the car and that [Clark] sat in the car and [Heflin] come out there to where they were laying and that [Heflin] said, 'If I can't have her, no one can' and knocked her out and when she woke up, [Wilson] was dead.

4

Ghea testified that defendant went on to explain how she was going to try to communicate with Clark so that they could "get their stories straight."

Patricia Holder, who described her relationship with defendant as "like sisters," testified that a few days before defendant married Wilson, defendant referred to Heflin as "her boyfriend." Holder asked her why she was marrying Wilson if she had a boyfriend and defendant responded, "that [Wilson's] son Chris needed to be in a stable home and [Heflin] was going to give her a year to marry [Wilson] and get everything stabilized where she could get custody of [Wilson's] son," and that she was then going to divorce Wilson. Shortly after the wedding, defendant told her, " '[Wilson] is going to die and when he does, I want you to sit by me at the funeral and nudge me in the side with your elbow so I can play the part of . . . the grieving widow.' " She further testified that defendant told her that she and Heflin were to have Wilson killed, take the life insurance money, and build them a log house.

In her defense, defendant submitted a statement from Clark's friend, Mary Kathy McKinney. According to her statement, Clark told her the night before Wilson's murder that he was "going to buy a gun," and that he spoke of "killing his step-dad" and what he would do with the money he would receive. The day after the murder he told her his stepfather was dead, and his mother had been beaten. Several days later, Clark told her he was going to get a truck and pay cash for it.

## PROSECUTORIAL MISCONDUCT

In his first issue defendant complains that the state committed prosecutorial misconduct when the prosecutor made improper statements during closing argument. Specifically, she points to the prosecutor's comments about defense counsel: "They are going to stand up here in a few minutes and they are going to ask you to violate your oath as a juror and disregard the law. That's what they are hired to do."

5

Prosecutors should not tell juries that defense counsel will ask them to violate their oaths and/or disregard the law. That is not what defense counsel is hired to do. A prosecutor's comments during final argument should not reflect unfavorably upon defense counsel. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). We must now determine whether this comment prejudiced defendant.

This Court has set out five factors which must be considered in making the determination whether a prosecutor's improper conduct could have affected the verdict to the prejudice of the defendant. These factors are as follows:

1. the conduct complained of in light of the facts and circumstances of the case;

2. the curative measures undertaken;

3. the intent of the prosecutor in making the improper remarks;

4. the cumulative effect of the improper conduct and any other errors in the record; and

5. the relative strength or weakness of the case.

State v. Philpott, 882 S.W.2d 394, 408 (Tenn. Crim. App. 1994) (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

Additionally, we may consider whether the remarks were lengthy or repeated or whether single or isolated. State v. Norris, 874 S.W.2d 590, 599 (Tenn. Crim. App. 1993). Cases are reversed only when the remarks "so infected the trial with unfairness as to make the resulting convictions a denial of due process." *Id.* (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

The challenged remarks, although clearly improper, did not deny this defendant due process and do not constitute reversible error. This issue is without merit.

## PRIOR CONSISTENT STATEMENTS

In her next issue, defendant contends that the trial court erred in admitting the prior written statements of two of the state's witnesses, Patricia Holder and Sherry Ghea. In each case, the state introduced the statement during redirect

examination, apparently to bolster the witness' credibility. Defense counsel's objection was overruled both times, and the statements were presented to the jury without any limiting instructions. The written statements are basically consistent with the witnesses' testimony on direct examination.

"Ordinarily, prior consistent statements of a witness are not admissible to bolster the witness' credibility." State v. Tizard, 897 S.W.2d 732, 746 (Tenn. Crim. App. 1994). Exceptions to this general rule include an attack on the witness designed to show that the witness "was motivated to lie or slant testimony," in which event a prior consistent statement may be admitted when it was made before the witness was motivated to lie. *Id. See also* N. Cohen *et al.*, **Tennessee Law of Evidence**, § 803 (1.1).3 at 509-10 (3d ed. 1995).

Defendant attempted to impeach Ghea's credibility by inferring that she implicated defendant in her prior statement in order to gain trusty status. This did not "open the door" for the state to introduce the entire statement under the prior consistent statement rule. The alleged motivation to secure trusty status, hence the motivation to lie, existed at the time of the prior statement and not before.

As to both Ghea and Patricia Holder, the prior statements were first mentioned by defense counsel on cross-examination. Defense counsel sought to establish that the prior statements did not contain certain additional facts mentioned by Ghea and Holder in their trial testimony. The state then secured admission of the prior statements to show the prior statements were consistent with the trial testimony of the witnesses.

The blanket introduction of the prior statements in their entirety appears improper. Even if proper, there should have been an instruction that the prior consistent statements could be considered for corroborative purposes only. *See* State v. Robinson, 971 S.W.2d 30, 43 (Tenn. Crim. App. 1997) (holding the failure of defense counsel to request such a limiting instruction waives the issue on appeal). Nevertheless, defendant has suffered no prejudice as a result of the admission of the prior statements. Given the remainder of the evidence against the

defendant, the introduction of the prior statements was clearly harmless. Tenn. R. App. P. 36(b).

## CO-DEFENDANT'S STATEMENT

Terry Holder testified about a conversation he had with defendant and Heflin, a severed co-defendant. During this conversation, defendant stated her intention to have Wilson killed and collect life insurance benefits. Upon hearing this, Heflin responded that defendant would then get the log house she wanted. The trial court ruled that the statement was non-hearsay. Defendant contends that Holder's testimony about Heflin's statement was improperly admitted hearsay.[2]

The state contends the testimony was not hearsay since it was not offered to prove the truth of the matter asserted. *See* Tenn. R. Evid. 801 (c). The state also contends the testimony qualifies under the co-conspirator hearsay exception. *See* Tenn. R. Evid. 803 (1.2)(E).

We need not determine whether the statement was hearsay or whether it qualified as a hearsay exception. The witness also testified that as a part of this same conversation, defendant stated her intention to have Wilson killed and collect life insurance proceeds. Furthermore, Clark and Patricia Holder testified the defendant stated she would get a new house if Wilson were killed. Thus, even if the admission of the questioned testimony was improper, it was clearly harmless error. Tenn. R. App. P. 36(b).

## SUFFICIENCY OF THE EVIDENCE

Finally, defendant contends that the evidence is insufficient to sustain her conviction. In Tennessee, great weight is given to the result reached by the jury in a criminal trial. A jury verdict accredits the state's witnesses and resolves all

---

[2]Defendant contends in her brief that Patricia Holder also testified that Heflin made this statement. The record does not support this allegation.

conflicts in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. Bigbee, 885 S.W.2d at 803; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, a guilty verdict removes the presumption of innocence which the defendant enjoyed at trial and raises a presumption of guilt on appeal. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The defendant has the burden of overcoming this presumption of guilt. *Id.*

Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

First-degree premeditated murder is an intentional and premeditated killing. Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1996). The proof in this case established overwhelmingly that defendant plotted to have Wilson killed and knowingly and intentionally delivered him to his place of execution. That she did not pull the trigger is irrelevant.

> A person is criminally responsible for an offense committed by the conduct of another if: [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.

Tenn. Code Ann. § 39-11-402(2). Moreover, the testimony of Clark, defendant's accomplice, was substantially corroborated by the state's remaining proof. *See* State v. Bigbee, 885 S.W.2d at 803 ("in Tennessee a conviction may not be based upon the uncorroborated testimony of an accomplice."). In short, the evidence in this case is more than sufficient to sustain defendant's conviction. This issue is

without merit.

The judgment below is affirmed.

_____
**JOE G. RILEY, JUDGE**

**CONCUR:**

_____
**DAVID H. WELLES, JUDGE**

_____
**JOHN EVERETT WILLIAMS, JUDGE**

10