IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 16, 2001

## STATE OF TENNESSEE v. RICKY T. HUGHES

**Appeal from the Criminal Court for Davidson County**
**No. 98-C-2298     Cheryl Blackburn, Judge**

---

**No. M2000-01846-CCA-MR3-CD - Filed May 21, 2002**

---

A Davidson County Criminal Court jury convicted the defendant, Ricky T. Hughes, of facilitation of first degree felony murder, a Class A felony, and especially aggravated robbery, a Class A felony. The trial court sentenced him to consecutive sentences of twenty-five years as a standard offender for the facilitation conviction and twenty-five years as a violent offender for the aggravated robbery conviction. The defendant appeals, claiming that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by denying his motion to suppress his confession, and (3) the trial court erred by not allowing him to testify about a prior consistent statement. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Bruce Poag (on appeal) and Lionel Barrett and Daniel McMurtry (at trial), Nashville, Tennessee, for the appellant, Ricky T. Hughes.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sharon L. Brox and Roger D. Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case relates to the murder and robbery of Frederick Hemple. Howard Hemple, the victim's father, testified that the twenty-one-year-old victim lived with him and that he last saw the victim alive on May 6, 1998. He said that about 1:45 p.m., he was at home with the victim and that he was getting ready to go to a doctor's appointment. He said that before he left, the victim told him that the victim was going to the defendant's house later that afternoon. He said that the victim and the defendant had gone to high school together and were friends.

Mr. Hemple testified that he went to his appointment and that when he returned home, the victim was gone. He said that by noon on May 7, the victim had not come home and that he knew something was wrong with the victim. He said that he paged the victim but that the victim did not answer the page. He said that the victim had his own telephone line and that the victim's caller identification box showed that the defendant had telephoned the victim about 4:00 p.m. on May 6. He said he telephoned the defendant and asked if the defendant had heard from the victim. He said the defendant told him that the victim had not shown up at the defendant's house on May 6.

Mr. Hemple testified that on May 8, someone found the victim's car in the Rapid Package System (RPS) parking lot about one-half mile from the defendant's home. He said that he called the police and that a few days later, the police found the victim's body. He said that the victim sold marijuana but that he did not know if the victim was carrying marijuana on May 6. He said the victim probably had money with him on the 6th.

Wendy Caudill Cook testified that she was engaged to the defendant and that she was living with him on May 6, 1998. She said Jon Goodale and Chris Goodale lived with them in the defendant's townhouse. She said that on May 6, she got home around 3:00 p.m. and that the defendant told her that he did not want her there because "something bad was going to happen." She said that she took a shower and left and that when she returned about thirty minutes later, a car she did not recognize was parked in the driveway. She said she went inside and found the defendant and Jon and Chris Goodale cleaning the kitchen and doing laundry. She said that the house smelled like bleach and that she saw blood on the carpet and a wicker chair.

Ms. Cook testified that the defendant was acting normally. She said the defendant told her that Chris Goodale had busted his knuckle and had bled everywhere. She said that a pair of shoes that she did not recognize was on the kitchen table and that a box cutter was beside the kitchen sink. She said the victim's registration to the strange car was lying on top of the entertainment system. She said that the defendant asked her if she knew anyone who wanted to buy marijuana and that the defendant did not normally sell marijuana. She said she had not been threatened by Jon or Chris Goodale.

Jennifer Eakes testified that she was in the defendant's home during the time the victim was missing. She said she saw blood on the carpet, and it looked like someone had tried to clean the carpet. She also saw a box cutter on the kitchen counter. She said that when she got home, she told her mother about what she had seen and that her mother called the police. She said that the next day, she invited Wendy Cook to her house. She said that while Ms. Cook was there, the police came and interviewed both of them. She said Ms. Cook left with the police.

Officer William Kirby of the Metro Nashville Police Department testified that he investigated the victim's murder. He said that at 2:00 a.m. on May 11, the police searched the defendant's townhouse pursuant to a search warrant. He said that when the police arrived, Wendy Cook, the defendant, and Jon and Chris Goodale were in the home. He said he saw bloodstains on the living room carpet and on a rocking chair. He said it looked like someone had tried to clean the blood from

the carpet. He said he saw blood spatter on doors and blinds. He said that a Luminal test revealed blood stains on the couch and a rug. He did not remember seeing a baseball bat or a box cutter in the home.

Detective Juan Borges of the Metro Nashville Police Department testified that in May 1998, he investigated a missing persons case involving the victim. He said that he interviewed the victim's father, the defendant, and Wendy Cook. He said that from those interviews, he obtained a search warrant for the defendant's home. He said he and other officers executed the search warrant on May 11 and found blood spots in the living room and kitchen. He said that about 4:30 a.m., he asked Wendy Cook, the defendant, Jon Goodale, and Chris Goodale if they wanted to go to the police department. He said all four went to the police department voluntarily. He said that about 7:40 a.m., he read the defendant his rights, the defendant signed a waiver of rights form, and he interviewed the defendant. He said that at first, the defendant denied being involved in a crime. He said that about twenty minutes later, the defendant admitted being present when the victim was killed but denied killing the victim. He said the defendant told him the following: On May 6, the victim and an African-American male came to his house. At some point, the African-American male hit the victim in the head with a baseball bat. A few minutes later, two more African-American males came to the townhouse and the defendant let them inside. The three males made the defendant help them dispose of the victim's body and clean up the townhouse. The three males threatened to kill the defendant if he did not help them.

Detective Borges testified that the defendant gave him directions to the victim's body and that he sent Sergeant Dwayne Phillips to look for the victim. He said that about 1:45 p.m., he interviewed the defendant again and that, at first, the defendant told the same story. He said that later, the defendant acknowledged killing the victim.

Detective Borges recorded the defendant's confession on an audiotape. The audiotape was played for the jury and revealed the following: On May 6, the defendant and Jon Goodale planned to rob the victim. When Wendy Cook came home, the defendant told her to leave. The victim arrived, and the defendant told the victim to give him the victim's money. The victim threw about two hundred dollars on the floor, and the defendant hit the victim with a baseball bat and cut the victim's throat. Jon Goodale was present during the murder and held the victim. Mr. Goodale also helped the defendant move the victim's body and clean the house. The defendant parked the victim's car at RPS, and he and Jon Goodale divided the money taken from the victim.

Detective Borges testified that the defendant never said he did not want to talk and never asked for an attorney. He said the police found the baseball bat about 360 feet from the defendant's home but never found the box cutter.

Sergeant Dwayne Phillips of the Metro Nashville Police Department testified that on May 11, 1998, the police searched the defendant's house pursuant to a search warrant. He said officers found blood in a rocking chair and in cracks in the floor. He said a Luminal test also revealed blood on the couch and on top of the washing machine. He said that outside the townhouse, he noticed a

garbage can with an orange trash bag in it. He said he thought that was unusual because orange symbolized biohazard. He said that later that day, he learned where the victim's body might be located. He said he went to that location, which was about two miles from the defendant's home, and saw a garbage dumpsite beside the road. He said that he noticed an orange trash bag similar to the one that he had seen earlier. He said that he called the Identification Unit and that officers came to the scene, secured it, and took photographs. He said officers found the victim's body in the orange trash bag.

Corporal Donald Smythe of the Davidson County Sheriff's Department testified that on May 11, he was working in the Booking Department. He said that as the defendant was being fingerprinted, he asked the defendant why the defendant was there. He said the defendant answered, "I killed somebody but I didn't mean to do it. It looks like I'll be here for a while. You can't beat a homicide charge."

Dr. John E. Gerber, a forensic pathologist with the Davidson County Medical Examiner's Office, conducted the victim's autopsy. He testified that the victim's death was a homicide and that the victim died of blunt and sharp force injuries to the head, neck, torso, and upper extremities. He said that the most lethal injury to the victim was a cut to the neck. He said that the victim's elbows had injuries that could have occurred if the victim crossed his arms over his face. He said that a baseball bat was consistent with the victim's blunt force injuries. He said that a cocaine metabolite was found in the victim's blood and that marijuana was detected in the victim's urine.

The defendant testified that on May 6, 1998, he was living with Wendy Cook, Jon Goodale, and Chris Goodale. He denied harming or killing the victim but acknowledged helping dispose of the victim's body. He said that the statements he gave to Detective Borges were not true. He said that Jon Goodale made up the story about the three African-American males and that Jon told him to go along with that story. He said that he later confessed to killing the victim because Jon threatened to harm the defendant's mother and Ms. Cook.

The defendant testified that on May 6, he got home about 2:30 p.m. and that Jon Goodale was at the townhouse. He said that Wendy Cook arrived about 3:00 p.m. and that Jon Goodale was upset because Ms. Cook was home early from work. He said that Chris Goodale came home about 3:30 p.m. and that he saw Jon and Chris talking on the front porch. He said that when Jon and Chris came inside, they were smiling. He said that Ms. Cook left the townhouse and that Jon made a telephone call. He said that later, the victim came to the townhouse. He said that he went downstairs and that the victim was sitting on the couch. He said that he went into the kitchen and heard the victim ask Jon if Jon had the victim's money. He said that Jon told the victim no and that the victim asked Jon if the victim could use the telephone. The defendant said that Jon let the victim use the telephone and that he heard a "clank." He said that as he walked from the kitchen back to the living room, he glanced up and saw that Jon had hit the victim with a baseball bat. He said that the victim asked Jon what Jon wanted and that Jon told the victim that he "wanted it all." He said that the victim threw money on the floor.

The defendant testified that Jon hit the victim again with the bat and that the victim ran toward the kitchen. He said that he looked in the kitchen and saw Chris hitting and kicking the victim. He said that the next time he looked into the kitchen, he saw Chris holding a knife or box cutter and walking away from the victim. He said blood was on the floor, and the victim was dead. He said he and Jon wrapped the victim in blankets and orange trash bags. He said he and Jon put the victim into the victim's car while Chris cleaned the house. He said that after he and Jon dumped the victim's body, they returned to help Chris clean the townhouse. He said he did not recall telling Corporal Smythe that he killed someone.

On cross-examination, the defendant acknowledged that the townhouse, baseball bat, and orange trash bags belonged to him. He said that he rode with Jon to the site where they dumped the victim's body and that Jon drove the victim's car to the RPS parking lot. He said Jon took the defendant's shoes and put them on a table in the house. He denied knowing what happened to the victim's money. He denied telling Ms. Cook that she needed to leave because something bad was going to happen, and he claimed she was lying when she testified that she came home and found the defendant, Jon, and Chris cleaning the house. He acknowledged that he never told the police that Jon threatened him.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions. The state claims that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree felony murder is, in pertinent part, an unlawful "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Pursuant to Tenn. Code Ann. § 39-11-403(a), a "person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony."

Especially aggravated robbery is defined as robbery that is "(1) [a]ccomplished with a deadly weapon; and (2)[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a).

A deadly weapon is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" Tenn. Code Ann. § 39-11-106(a)(5)(B).

We believe that the evidence is sufficient to support the defendant's convictions for facilitation of first degree felony murder and especially aggravated robbery. In a taped confession, the defendant said that on May 6, he planned to rob the victim and that when the victim arrived at his home, he told the victim to give him the victim's money. He stated that the victim threw the money on the floor and that he hit the victim with the baseball bat, cut the victim's throat, and divided the victim's money with Jon Goodale. We believe that in the light most favorable to the state, this evidence was sufficient for the jury to find that the defendant committed especially aggravated robbery.

Furthermore, Wendy Cook testified that when she came home at 3:00 p.m. on May 6, the defendant, Jon Goodale, and Chris Goodale were at the townhouse and that the defendant told her to leave because something bad was going to happen. She also testified that when she returned about 4:00 p.m., blood was on the carpet, the victim's car registration was on the entertainment center, and the defendant, Jon, and Chris were cleaning the house with bleach. We believe that this evidence was sufficient for the jury to conclude that the defendant knowingly assisted with committing the especially aggravated robbery, which resulted in the victim's death. As with the testimony of witnesses, the jury was entitled to believe part of the defendant's statements while rejecting other parts. Batey v. State, 527 S.W.2d 148 (Tenn. Crim. App. 1975). Therefore, viewed in the light most favorable to the state, the evidence is sufficient to support the convictions.

## II. MOTION TO SUPPRESS

Next, the defendant contends that the trial court erred by denying his motion to suppress his May 11 confession. He claims that he did not make his confession knowingly and voluntarily. The state contends that the trial court correctly denied the defendant's motion to suppress. We agree with the state.

At the suppression hearing, Detective Borges testified that he first interviewed the defendant about 7:00 a.m. on May 11, 1998, at the police department. He stated that he read the defendant his Miranda rights from a waiver of rights form and that he asked the defendant if the defendant understood them. He said that the defendant said yes and that the defendant may have read the form. He said that the defendant signed the form and did not appear to be under the influence of drugs or alcohol. He said that the defendant never asked for an attorney and was eager to talk to him. He said that he did not make any threats or promises to the defendant.

On cross-examination, Detective Borges acknowledged that when the police served the search warrant, officers initially handcuffed the defendant and the other people in the townhouse, but he said it was for police safety. He stated that the defendant was not under arrest at that time, but he admitted that it was standard procedure to handcuff people who were under arrest. He said that after the townhouse had been secured, officers removed the handcuffs. He said that at some

point, he asked the defendant and his roommates if they would go voluntarily to the police department. He said that they said yes and that the defendant and his roommates rode in the back of his unmarked patrol car to the police station. He said that at the police station, the defendant and his roommates waited in the hallway together and that the defendant was "free to do whatever he wanted to do." However, he said that while he was interviewing the defendant, the defendant was secluded from his roommates. He said that the defendant implicated himself about 8:30 a.m. but that the defendant was not arrested until about 5:00 p.m. He said the defendant never asked for an attorney.

The defendant did not testify at the hearing. However, the record reflects that police officers served the May 11 search warrant at 2:00 a.m. and that about 4:00 a.m., Detective Borges asked the defendant if he would go to the police station voluntarily. The record also reflects that the defendant signed the waiver of rights form at 7:43 a.m. and that he confessed to killing the victim sometime after 1:30 p.m.

The trial court found that the defendant voluntarily accompanied Detective Hughes to the police station and that the defendant was not in custody until he was arrested about 6:30 p.m. Moreover, the trial court determined that the defendant voluntarily waived his Miranda rights before he confessed to killing the victim.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Further, questions of the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. at 628. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23. Finally, both the proof adduced at the suppression hearing and the proof adduced at trial may be considered in reviewing the trial court's decision on the motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Miranda v. Arizona, the United States Supreme Court held that pursuant to the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination, police officers must advise a defendant of his or her right to remain silent and right to counsel before they may initiate custodial interrogation. 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966). If these warnings are not given, statements elicited from the individual may not be admitted for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994). A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. The state has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant

has validly waived his Miranda rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992).

The defendant contends that the confession he gave to Detective Borges on the afternoon of May 11 should have been suppressed. He contends that although Detective Borges read the Miranda rights during the first interview, the totality of the circumstances surrounding his confession indicate that his confession was not voluntary.

Our review of the record supports the trial court's finding that the defendant voluntarily waived his Miranda rights. Detective Borges testified that he read Miranda warnings to the defendant during the defendant's first interview, and the defendant signed a waiver of rights form. Detective Borges testified that the defendant was not under the influence of drugs or alcohol and that the defendant never requested an attorney. In addition, he said that he did not threaten the defendant or promise him anything. The defendant did not testify to the contrary, and the evidence does not preponderate against the trial court's finding.

### III.  PRIOR CONSISTENT STATEMENT

Finally, the defendant contends that the trial court erred by not allowing him to prove that one week before trial, he gave a statement to police that was consistent with his trial testimony. Although the trial court ruled that such evidence was inadmissible hearsay, the defendant contends that such evidence was not hearsay because defense counsel was not attempting to bolster his credibility and because he was not going to testify as to the substance of the prior consistent statement. Moreover, he contends that he was harmed by the trial court's ruling because he was "precluded from testifying before the jury that the reason he gave an incriminating statement to the police on May 11, 1998, was because the lives of his immediate family and fiancee were being threatened by Jon Goodale." He claims that his attorney "should have been permitted to ask [him] what actually took place on May 6, 1998, and . . . if what happened on May 6, 1998, was what he told the police a week before his trial." The state argues that the trial court correctly ruled that the defendant's prior consistent statement was inadmissible. We agree with the state.

The defendant testified during direct examination that he did not kill the victim but that he helped dispose of the victim's body. He said that he confessed to killing the victim because Jon Goodale threatened to harm the defendant's mother and Wendy Cook. Defense counsel then asked the defendant if he had made a statement to the police a week before trial. Before the defendant could answer, the state objected, and the trial court held a jury-out hearing. In the hearing, defense counsel stated that one week before trial, the defendant gave a statement to police that was consistent with his trial testimony. Counsel argued that he was not going to ask the defendant the substance of the prior statement but that he merely was going to ask him if he made the prior consistent statement. The trial court stated that based on State v. Terry Stephens, No. 01C01-9709-CR-00410, Davidson County (Tenn. Crim. App. Aug. 24, 1998), evidence of the defendant's prior consistent statement could be introduced only if the defendant made the statement before he confessed to

Detective Borges on May 11. The trial court ruled that because the defendant made the prior consistent statement after that date, the statement was inadmissible hearsay.

Generally, evidence of a prior consistent statement is not admissible to bolster a witness's credibility. State v. Hodge, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998) (citing State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). One exception to this general rule is that evidence of "prior consistent statements may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made or when deliberate falsehood has been implied." State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). However, this court has stated, "If and only if a witness is impeached by a prior inconsistent statement or there is some insinuation of recent fabrication or deliberate falsehood, his testimony may be bolstered or corroborated by showing that he has made previous statements out of court similar to and consistent with his testimony on the stand." Terry Stephens, slip op. at 8 (citing Farmer v. State, 201 Tenn. 107, 113, 296 S.W.2d 879, 882 (Tenn. 1956); State v. Tizard, 897 S.W.2d 732, 746 (Tenn. Crim. App. 1994); State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993)). In such a situation, evidence of a prior consistent statement is allowed to show that the trial testimony is consistent with what the witness said when no influence or motive to lie existed. Sutton v. State, 155 Tenn. 200, 204, 291 S.W. 1069, 1070 (1927). In other words, the witness must have made the prior consistent statement before he made the impeaching inconsistent statement. Terry Stephens, slip op at 9.

Initially, we note that we see no basis for the defendant's claim that he was precluded from testifying about Jon Goodale threatening him or about what happened to the victim on May 6. To the contrary, the record reveals that the defendant testified at length about Jon Goodale's threat and about the defendant's version of the victim's May 6 murder. In any event, the exception to the inadmissibility of prior consistent statements does not apply in this case because the defendant had not been impeached by the state. Moreover, the defendant made the alleged prior consistent statement after his prior inconsistent statement, i.e. his May 11, 1998 confession. Therefore, we conclude that the trial court properly ruled that the defendant's prior consistent statement was inadmissible.

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE

-9-