IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 9, 2008

**STATE OF TENNESSEE v. DARNELL HUBBARD**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-08051     Lee V. Coffee, Judge**

---

**No. W2007-02482-CCA-R3-CD  -  Filed August 20, 2009**

---

A Shelby County Criminal Court Jury convicted the appellant, Darnell Hubbard, of the first-degree premeditated murder of his wife, and he was sentenced to life without the possibility of parole. On appeal, the appellant contends that the trial court erred by admitting evidence of his prior acts of violence against the victim. He also challenges the trial court's admission of evidence relating to an ex parte order of protection that the victim obtained against him and other statements the victim made to her son and police. We conclude that the trial court erred in admitting hearsay statements from the victim in violation of the appellant's confrontation rights. However, in light of the overwhelming evidence of the appellant's guilt, the errors were harmless beyond a reasonable doubt. Accordingly, we affirm the appellant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

James Hale, Memphis, Tennessee, for the appellant, Darnell Hubbard.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In the early morning hours of June 12, 2006, the appellant stabbed Lexie Hubbard twelve times, killing her. At trial, the victim's fifteen-year-old daughter, Ashley Jones, testified that she arrived home around midnight and saw her eleven-year-old brother and the victim watching

television together in the dining room. The victim's son and another daughter were asleep in their bedrooms, and the appellant, "Ricky," was in the victim's bedroom. Jones went to bed. She was awakened by a crashing sound, and she heard the victim say, "No, Ricky, no. Don't do it; don't do it."

Jones rushed to her mother's bedroom and saw the appellant pull a nine-inch knife out of the victim's chest while the victim was "slouched" over on the floor. Jones yelled for her older brother, Demarlon Davis, and told him the appellant had stabbed their mother. Jones ran to the kitchen, obtained two knives, and gave them to Davis. The appellant emerged from the bedroom; swung the knife he had used to stab the victim at Jones, Davis, and others in the house; and ordered them to move. During the confrontation, the victim moved into Jones' bedroom and locked the door. The appellant grabbed the victim's keys and ran outside, and Davis chased him. Jones initially ran after Davis and the appellant but returned to the house because she was concerned about the victim. Before paramedics arrived, the victim was breathing hard and was in and out of consciousness. A firefighter at the scene informed Jones that the victim had died.

Jones testified that the victim wanted a divorce from the appellant so that she could marry someone else. Three days before the stabbing, the appellant called and left messages on the victim's cellular telephone. The victim let Jones listen to one of the messages in which the appellant, in an angry voice, threatened to kill the victim. Jones said that the appellant had threatened to "get" her and her mother in the past. She said that the appellant often threatened and tried to fight with the victim when Jones' brothers were not around but that when the victim's sons were present it "would be a peaceful day." Jones recalled that the victim called the police a few days before the stabbing because the appellant was trying to get into their home. The police came but told the victim that the appellant was allowed in the house because they were married.

Jones said that she occasionally cleaned her mother's room and that a few times she found a large knife from the kitchen knife set tucked under the mattress on the appellant's side of the bed. The knife the appellant used to kill the victim was one of the knives. Jones removed the knives she found in the victim's bedroom and hid them elsewhere because she was worried that the appellant was going to kill the victim.

Jones testified that a couple of years before the victim's death, she saw the appellant threaten to kill the victim with a knife. On that occasion, the appellant waited until everyone in the house was asleep. Jones awoke to see the appellant standing over the victim with a knife in his hand. The appellant threatened to kill the victim, but the victim and her children convinced him to leave instead. Jones also recalled another instance when she saw the appellant punch the victim, "busting" her lip.

The victim's son, Demarlon Davis, testified that on the night of the stabbing he heard the appellant urging the victim to go to bed. He also heard the appellant tell the victim that if he could not have her, nobody would. The victim told Davis that the appellant threatened to kill her and that she did not feel right with the appellant in the house. Davis offered to force the appellant to leave,

but the victim declined and said that she was going to sleep. Davis went to bed and was awakened by his sister's screams. Davis said that upon hearing the screams, he "ran down toward like in [his] momma's room and [his] momma's whole gown was soaking wet with nothing but blood." The victim told him that she was "fixing to die" and that the appellant had stabbed her "a whole lot of times." Davis saw the appellant come out of the victim's bedroom with a knife. The appellant was "swinging" the knife at Davis and his daughter. Afterward, the appellant ran from the house. Davis chased the appellant until the appellant was apprehended by police.

Dr. Bruce Levy, the Chief Medical Examiner for the State of Tennessee, described the victim's multiple stab wounds. He said that the victim had twelve sharp force injuries. Ten wounds were described as "major stab wounds," and one pierced the right ventricle of the heart. The victim bled to death as the result of the injuries.

The victim's sister, Leslie Adams, testified about the appellant's relationship with the victim. She said that the victim and the appellant fought frequently and often lived apart. According to Adams, the victim moved to the home where she was living at the time of her death in order to get away from the appellant. When the victim lived at her previous residence, she asked Adams to stay with her at times when the appellant was at the residence because she was afraid of him. Adams never saw the appellant hit the victim, but, on one occasion, she saw him try to stab her. She said that on that occasion, the victim and appellant were arguing over something petty and the appellant tried to stab the victim with a long kitchen knife. Adams said that she jumped between the appellant and the victim to prevent the stabbing.

Adams also testified regarding an altercation involving the appellant and the victim at their place of employment. Adams said the appellant had "whupped" the victim with a chair and poured bleach on her. Adams said that after the altercation, the victim left work and went to Adams' home. The victim was on her way to "press charges" against the appellant. The victim was very upset and was crying. The victim told Adams that "that n-----, well, . . . you know, said in a violent way that he had done whupped on her jaw." Adams said that the appellant had knocked the victim's teeth out and that she was "all bruised up." The victim was "shaken" and said that she could not believe that the appellant "flipped" and "did this." Adams had heard the appellant threaten the victim many times and had heard him tell her that if he could not have her, nobody would. The victim told Adams that the only way the appellant would "get" her would be in her sleep.

Debora Coffman, a counselor with the Shelby County Citizen's Dispute, testified that she met with the victim on November 9, 2005, and helped the victim apply for an ex parte order of protection against the appellant. The victim told Coffman that she was afraid of the appellant because he had threatened to "get" her and because he had struck her with a chair and his fist in the past. Although an ex parte order of protection was issued, the case was dismissed a couple of weeks later because neither party showed up for the court hearing.

Memphis Police Department Sergeant Degrah Bell testified that she investigated the victim's domestic violence complaints against the appellant. In April 2002, the victim filled out a police

report, alleging that the appellant had attacked her with a metal chair while she was working. Sergeant Bell met with the victim. The victim was afraid and told Sergeant Bell that the appellant had attacked her because she had refused to give him a ride home. After a prosecutor determined that there was probable cause, Sergeant Bell prepared a warrant for aggravated assault against the appellant. In 2004, Sergeant Bell spoke with the victim by telephone to investigate another police report the victim had filed against the appellant alleging domestic violence. The victim told Sergeant Bell that the appellant attacked her physically and threatened to kill her with a knife and some bleach. The victim said that no further action was needed on the police report because the appellant had moved out of the home and she felt safe.

## II. Analysis

On appeal, the appellant argues that the trial court improperly admitted evidence of his prior bad acts in violation of Tennessee Rule of Evidence 404(b) and that the trial court erred when it allowed the state to introduce hearsay evidence of statements the victim made about the appellant in violation of his confrontation rights. The appellant does not dispute that he is responsible for the victim's death, but he argues that the trial court's errors in admitting the evidence of his prior acts of violence and threats against the victim improperly inflamed the jury when it considered whether the homicide was first or second degree murder.

## A. Rule 404(b)

With respect to Tennessee Rule of Evidence 404(b), the appellant challenges the trial court's admission of Ashley Jones' testimony that she found knives hidden in the victim's bedroom, her testimony regarding the prior incident when she saw the appellant threaten the victim with a knife, and her testimony that she saw the appellant "punch" the victim. He also contends that the trial court erred by allowing Leslie Adams to testify that she had seen him threaten the victim with a knife on a previous occasion and that Adams should not have been allowed to testify about the injuries the appellant inflicted upon the victim at work.

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). In other words, a party may not use character evidence to show that a person acted in a particular way because he or she had a propensity to do so. State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999); State v. Parton, 694 S.W.2d 299, 304 (Tenn. 1985) (observing that evidence of another crime is not admissible to show that the defendant is the kind of person who would tend to commit the offense); State v. Tizard, 897 S.W.2d 732, 743 (Tenn. Crim. App. 1994) (noting that character evidence may not be used to show propensity to act). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b).

However, such evidence may be admitted for other purposes if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its

prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.; Parton, 694 S.W.2d at 302. Admissibility of other crimes, wrongs, or acts is also contingent upon the trial court finding by clear and convincing evidence that the prior crime, wrong, or act was actually committed. Tenn. R. Evid. 404(b); Wyrick, 62 S.W.3d at 771. The jury may consider evidence admitted under 404(b) as substantive evidence at trial. Wyrick, 62 S.W.3d at 771.

Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

### 1. Ashley Jones' Testimony

The appellant contends that the trial court erred in allowing Ashley Jones' testimony about finding knives in the victim's bedroom and her testimony that she witnessed prior threats and acts of violence the appellant committed against the victim. Initially, we note that the appellant failed to raise any issue with respect to Ashley Jones' testimony in his motion for new trial. Rule 3(e) of the Tennessee Rules of Appellate Procedure specifically provides that

> in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, . . . or other action committed or occurring during the trial of the case, . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Accordingly, the appellant has waived these issues.

We further conclude that the appellant is not entitled to plain error relief with respect to the admission of the testimony of Ashley Jones. See Tenn. R. App. P. 36(b). "When necessary to do substantial justice," this court may address an "error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial . . . ." Id. For an issue to be considered plain error, each of the following five factors must be met:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached; (c)
> a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and (e)
> consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (quoting Tenn. R. Crim. P 52(b)[1]) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

The record reflects that the trial court held a jury-out hearing in compliance with Tennessee Rule of Evidence 404(b) before admitting Jones' testimony. The trial court concluded that Jones' testimony concerning the knives Jones found hidden on the appellant's side of the bed and her testimony about the acts of violence and threats she witnessed were admissible to show premeditation and intent, lack of accident or mistake, motive, and a complete picture of the events surrounding the killing. The trial court further concluded that the probative value of the testimony was not outweighed by any danger of unfair prejudice. We agree with the trial court's assessment. The admission of Jones' testimony did not breach a clear and unequivocal rule of law that adversely affected a substantial right of the appellant; therefore, the appellant is not entitled to plain error relief.

### 2. Leslie Adams' Testimony

Next, the appellant contends that the trial court erred by allowing Leslie Adams' testimony about the prior incident when the appellant attempted to stab the victim with a knife. Here again, the record reflects that the trial court complied with the procedural requirements of Rule 404(b). At the conclusion of the jury-out hearing, the trial court ruled that Adams' testimony was clear and convincing evidence of the prior incident and that the testimony was admissible to show "intent, knowledge, premeditation, . . . motive" and to show the "complete story" of violence and hostility

---

[1] Effective July 1, 2009, Rule 52(b) of the Tennessee Rules of Criminal Procedure was deleted in its entirety, and the plain error language was added to Rule 36(b) of the Tennessee Rules of Appellate Procedure. See Tenn. R. App. P. 36(b) and Tenn. R. Crim. P. 52, Advisory Comm'n Cmts. (2009).

that led to the killing.  The trial court did not abuse its discretion when it admitted the testimony for the stated purposes.

In his appellate brief, the appellant also challenges the trial court's admission of Adams' testimony about injuries the victim told her she received as the result of the appellant hitting her with a chair at work.  The appellant has waived the issue by failing to include it in his motion for new trial.  Tenn. R. App. P. 3(e).  Moreover, we note that the appellant is not entitled to plain error relief on the issue.  The record supports the trial court's determination that the victim's statements to Adams following the attack were excited utterances under Tennessee Rule of Evidence 803(2).

## B.  Hearsay and Confrontation

Next, the appellant contends that the trial court erred by allowing into evidence statements the victim made to Debora Coffman, Demarlon Davis, and Sergeant Degrah Bell.  He contends that the admission of the statements violated hearsay rules and his constitutional right to confront the witnesses against him.  He argues that the trial court erroneously relied on State v. Ivy, 188 S.W.3d 132 (Tenn. 2006), and the forfeiture by wrongdoing hearsay exception because there is no proof in the record that he killed the victim to procure her unavailability as a witness.  The State concedes that admission of the hearsay evidence was error but contends that the error was harmless beyond a reasonable doubt.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule.  Tenn. R. Evid. 802.  The "forfeiture by wrongdoing" exception allows the admission of a hearsay statement "against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness."  Tenn. R. Evid. 804(b)(6).  "Even intentional misconduct, such as killing a witness, does not qualify unless done for the purpose of procuring the witness's unavailability."  Neil P. Cohen et al., Tennessee Law of Evidence § 8.39[2][c] (LEXIS publishing, 5th ed. 2005).  In determining whether hearsay is admissible under the rule, the trial court must conduct a jury-out hearing and "find that a preponderance of the evidence establishes 1) that the defendant was involved in or responsible for procuring the unavailability of the declarant; and 2) that a defendant's actions were intended, at least in part, to procure the absence of the declarant."  Ivy, 188 S.W.3d at 147.  For the exception to apply, there must be "a showing that a defendant's actions were intended, at least in part, to prevent a witness from testifying."  State v. Brooks, 249 S.W.3d 323, 325 (Tenn. 2008).

The forfeiture by wrongdoing exception to an accused's confrontation rights under the Sixth Amendment to the United States Constitution likewise requires a showing that the defendant "engaged in conduct *designed* to prevent the witness from testifying."  Giles v. California, ___ U.S. ___, 128 S. Ct. 2678, 2683 (2008) (emphasis in original).  The Sixth Amendment to the Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  In addition, article I, section 9 of the Tennessee Constitution provides

-7-

that "in all criminal prosecutions, the accused has the right to . . . meet the witnesses face to face." "Although the language of the federal and state constitutional provisions is somewhat different, in determining the rights of an accused under article I, section 9, [Tennessee courts] have traditionally adopted and applied the standards enunciated by the United States Supreme Court." State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008); see also State v. Lewis, 235 S.W.3d 136, 144 (Tenn. 2007).

In Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004), the Supreme Court analyzed the Sixth Amendment right to confrontation and drew a distinction between the admission of testimonial and nontestimonial hearsay. The Court explained that the admission of nontestimonial hearsay is exempt from Confrontation Clause scrutiny; however, the "Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination" for the admission of testimonial hearsay. 541 U.S. at 68, 124 S. Ct. at 1374. Although the Court declined to define "testimonial" comprehensively, it explained that the term "applies at a minimum to prior testimony . . . and to police interrogations." Id. Since Crawford, the Court has clarified that statements to police are nontestimonial when "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273 (2006). However, statements made in the course of police interrogations under circumstances indicating that there is no ongoing emergency and "that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" are testimonial. Davis, 547 U.S. at 822, 126 S. Ct. at 2274; see also Cannon, 254 S.W.3d at 302.

The Crawford court also acknowledged the forfeiture by wrongdoing doctrine as an exception to an accused's confrontation rights. The court explained that "[t]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds." Crawford, 541 U.S. at 62, 124 S. Ct. at 1370. In other words, "if a witness is absent by [the defendant's] own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away." Reynolds v. United States, 98 U.S. 145, 158 (1879). "The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong." Id. at 159.

The Court further explained the forfeiture by wrongdoing exception to the right of confrontation in Giles v. California, ___ U.S. ___, 128 S. Ct. 2678, 2683 (2008). Three weeks before the defendant shot her to death, the victim in Giles complained to police that Giles had choked and threatened to kill her. Giles, 128 S. Ct. at 2681-82. The prosecution introduced evidence of the prior domestic violence report in the murder trial to rebut Giles' contention that he shot the victim in self-defense. Id. Without considering whether Giles intended to prevent the victim from testifying, the trial court and California appellate courts held that admission of the testimony was proper under both a state law hearsay exception and under the forfeiture by wrongdoing exception to the Confrontation Clause. The Supreme Court rejected the state court analysis and held that the forfeiture by wrongdoing exception to the Confrontation Clause requires a showing that the defendant intended to prevent the unavailable witness from testifying. Id. at 2682.

In reaching its decision, the Giles court provided some guidance with respect to the types of evidence that may be available to establish a defendant's intent to prevent testimony in cases involving domestic violence. The court explained:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution – rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

Id. at 2693.

In the present case, the appellant argues that there is no evidence in the record demonstrating that he killed the victim to prevent her testimony and that the trial court erred by applying the forfeiture by wrongdoing exception to the hearsay rule and Confrontation Clause. The State concedes that it failed to prove by a preponderance of the evidence that the appellant killed the victim to procure her unavailability as a witness and that the victim's statements – both testimonial and nontestimonial – were therefore not admissible under the forfeiture by wrongdoing exception to the hearsay rule or Confrontation Clause. After carefully reviewing the record in this case, we agree with the parties that the trial court erred by admitting statements the victim made to Coffman to obtain the order of protection, statements the victim made to Davis, and the domestic violence allegations the victim made to Sergeant Bell.

## 1. Coffman Testimony

The record reflects that the trial court initially ruled that Debora Coffman's testimony concerning statements the victim made while obtaining the temporary order of protection would be inadmissible based on hearsay and confrontation concerns. However, without presenting any evidence, the State convinced the court to change its ruling based on State v. Ivy, 188 S.W.3d 132 (Tenn. 2006), during a jury-out hearing after opening statements. In finding that the testimony concerning the allegations the victim made in obtaining the temporary order of protection fit within the forfeiture by wrongdoing exception, the court explained:

> The Court finds that they are hearsay statements, but under 804(b)(6), the Court further finds given the rulings of the Supreme Court in the David Ivy case, that the Crawford and Maclin concerns are

extinguished by this defendant making his victim unavailable, not necessarily for a murder prosecution, as every victim would be unavailable for a murder prosecution, but also, unavailable for any other actions that the victim might have pursued against this defendant, and the Court will allow the contents in these statements that were made by this alleged victim to Miss Coffman to be admitted in the State's case in chief as the Supreme Court has seen fit to rule that those statements should be admissible under those circumstances.

The Court does find that they are relevant as indicated earlier for the intent and knowledge and premeditation, to show all of the circumstances surrounding the intent, to show, as the trial court ruled in the David Ivy case, what the motive of this killing might have been, and to paint an accurate picture of the hostility that existed in the relationship between . . . Darnell Hubbard . . . and Lexie Hubbard, and for all of those reasons, all of the facts and circumstances surrounding that offense will be admissible for those limited purposes as indicated earlier.

Statements the victim made about the appellant in order to obtain an order of protection against him were testimonial in nature. Before applying the forfeiture by wrongdoing exception to the Confrontation Clause and hearsay rule, the trial court was required to find by a preponderance of the evidence that the appellant's actions were intended, at least in part, to prevent the victim's testimony. Giles, __ U.S. ___, 128 S. Ct. at 2683; Brooks, 249 S.W.3d at 328; Ivy, 188 S.W.3d at 147. Although the court noted that the victim was unavailable for other actions that the victim might have pursued against the appellant and that statements the victim made in obtaining the order of protection were relevant to the appellant's motive, the court made no finding with respect to the appellant's intent to prevent the victim from testifying. The case involving the ex parte order of protection had been dismissed, and the State presented no evidence that the appellant's actions were designed to prevent the victim's testimony. Accordingly, the victim's statements to Coffman and the affidavit the victim completed to obtain the order of protection should have been excluded.

### 2. Demarlon Davis

When Demarlon Davis began to testify that the victim told him that the appellant "constantly" threatened to kill her when they were alone, the defense objected on hearsay grounds. The State responded that the forfeiture by wrongdoing exception applied, and the court overruled the objection based on its previous rulings. Davis was allowed to testify that the victim had multiple problems with the appellant when they were alone and that the victim told him that the appellant threatened to kill her. The trial court should have excluded the testimony as inadmissible hearsay. The forfeiture by wrongdoing exception to the hearsay rule was inapplicable in the absence of proof that the appellant's actions were intended to prevent the victim's testimony, and the State presented no proof establishing the applicability of any other hearsay exception.

### 3. Sergeant Bell

Finally, the appellant challenges the admission of Sergeant Bell's testimony concerning the victim's prior complaints to police. Sergeant Bell testified that the victim filed a police report in 2002 asserting that the appellant had attacked her with a metal chair, and a warrant charging the appellant with aggravated assault was issued. She said that she talked to the victim again in 2004 when the victim filed a report claiming that the appellant physically fought her, grabbed her by the neck, and threatened to kill her with a knife and some bleach. The victim told Sergeant Bell that no further action was needed on the 2004 report because the appellant was no longer living with her.

The trial court held a jury-out hearing in accordance with Rule 404(b) of the Tennessee Rules of Evidence before admitting Sergeant Bell's testimony. In concluding that Sergeant Bell's testimony was admissible, the court again cited State v. Ivy, 188 S.W.3d 132 (Tenn. 2006), and said that the evidence was relevant "to give the jury a complete picture of the violence that [the appellant] visited upon this victim and the threats that he has made, to show a motive for this killing, his threats having been made previously that if he could not have Miss Hubbard, that no one would." The court also found that the testimony was admissible to show hostility that existed in the relationship, to corroborate the testimony of other witnesses who had been questioned about whether prior incidents between the appellant and victim had been reported to police, and as being probative of premeditation. We conclude that the admission of Sergeant Bell's testimony, without a finding that the appellant was motivated, at least in part, to prevent the victim's testimony, violated the hearsay rules and the appellant's confrontation rights.

### C. Harmless Error Analysis

Having determined that the trial court erred by admitting the victim's hearsay statements to Debora Coffman, Demarlon Davis, and Sergeant Bell, we must now decide the effect of the errors. In conducting harmless error analysis, our supreme court has identified three categories of errors: (1) structural constitutional error; (2) non-structural constitutional error, and (3) non-constitutional error. State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008); State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003); State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000); State v. Harris, 989 S.W.2d 307, 314-15 (Tenn. 1999).

Structural constitutional errors involve "defects in the trial mechanism" that "compromise the integrity of the judicial process itself." Rodriguez, 254 S.W.3d at 371. Structural constitutional errors "have an impact upon '[t]he entire conduct of trial from beginning to end'" and require automatic reversal. Momon v. State, 18 S.W.3d 152, 165 (Tenn. 1999) (quoting Arizona v. Fulminante, 499 U.S. 279, 311, 111 S. Ct. 1246, 1265 (1991)). The denial of the right to counsel, denial of the right to self-representation at trial, denial of the right to a jury trial, and racial discrimination in grand jury selection are examples of structural constitutional errors. Rodriguez, 254 S.W.3d at 361; Momon, 18 S.W.3d at 165-66.

Constitutional errors that are not structural do not require automatic reversal. "However, the

burden on the State to demonstrate that a non-structural constitutional error is harmless remains quite stringent. The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." Rodriguez, 254 S.W.2d at 361. The test to be applied is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. (quoting State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002)).

As for non-constitutional errors, a defendant challenging a conviction has the burden of demonstrating that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); 254 S.W.3d at 361. Appellate courts consider the entire record in evaluating whether the error affected the outcome of the trial. Id. To the extent that the trial court erred by admitting non-testimonial hearsay statements the victim made to Davis, the appellant bears the burden of demonstrating that the error affected the outcome of the trial or prejudiced the judicial process.

Like other Confrontation Clause errors, the trial court's admission of the statements the victim made to Coffman and Sergeant Bell are non-structural constitutional errors. Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436 (1986); Cannon, 254 S.W.3d at 306. Thus, in order to sustain the appellant's conviction, the state has the burden of proving beyond a reasonable doubt that the errors did not contribute to the appellant's conviction. In our view, the State has met its burden.

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation can be inferred from the manner and circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill, evidence of the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id.

Even without the erroneously admitted evidence of the victim's prior statements, the record in this case is replete with proof that the appellant intentionally and with premeditation killed the victim. It is undisputed that the appellant killed the unarmed victim by stabbing her twelve times. Jones, Davis, and Adams all heard the appellant threaten the victim many times. On numerous occasions, Davis and Adams heard the appellant tell the victim that if he could not have her, nobody would. Both Jones and Adams had seen the appellant use a knife to threaten the victim in the past, and Jones had found large kitchen knives, including the knife used to kill the victim, hidden under the appellant's side of the mattress in the victim's bedroom. Jones also testified that the victim wanted to end the relationship with the appellant and described how the victim unsuccessfully sought police help to keep the appellant out of her home a few days before the killing. Jones told the jury about the angry message the appellant left, threatening to kill the victim just three days before the stabbing. Hours before the appellant carried out the threat, Davis heard the appellant again tell the

victim that if he could not have her, nobody would.  In light of the overwhelming proof of the appellant's guilt, we are convinced that the erroneously admitted hearsay evidence had no impact on the jury's verdict.  Accordingly, we affirm the appellant's conviction.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE