# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 12, 2011 Session

## JOHN WILLIAMS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 01-08325-33      John T. Fowlkes, Jr., Judge**

---

**No. W2010-01013-CCA-R3-PC  -  Filed September 1, 2011**

---

The Petitioner, John Williams, appeals the Shelby County Criminal Court's denial of post-conviction relief from his convictions for five counts of especially aggravated kidnapping and three counts of aggravated robbery, with an effective sentence of 161 years. He contends that the trial court violated his constitutional right to a public trial and that counsel rendered ineffective assistance by failing to object to partial closure of the trial and failing to raise the issue on direct appeal. Because the trial court's order denying post-conviction relief is incomplete, we reverse the judgment and remand the case to the trial court for findings of fact and conclusions of law on the ineffective assistance of counsel claim.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Robert C. Brooks, Memphis, Tennessee, for the appellant, John Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Alexia Fulgham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner was convicted of offenses he committed with five other individuals. He and co-defendant Jarvis Williams were tried together. On direct appeal of the Petitioner's and co-defendant Williams's convictions, this court affirmed the trial court's judgments. See State v. Jarvis Williams & John Williams, No. W2002-03010-CCA-R3-CD, Shelby County (Tenn. Crim. App. Dec. 23, 2003), app. denied (Tenn. May 10, 2004).

This court's summary of the facts in that appeal as they pertained to the Petitioner included testimony from victims Kimberly Hancock, Divin Wright, Omar Coleman, Oliver Wright, Tonyell Somerville, and Ms. Somerville's son, who was seven years old at the time of the offense. Id., slip op. at 1-5. According to their testimony, Ms. Hancock, Divin Wright, Mr. Coleman, and two other individuals drove to Marion Vaughn's house on the night of January 11, 2001. Ms. Vaughn was Ms. Hancock's friend, and Ms. Hancock wanted to retrieve clothing she had left at the house. Ms. Hancock and Mr. Wright entered the house while the others waited in the car. The Petitioner and co-defendant were in the house with Ms. Vaughn, Torrez Talley, and Thaddeus Brown.

Ms. Hancock testified that when she went upstairs to gather her clothes, the Petitioner followed her, yelled, "[S]omebody is fixing to die," grabbed her by the neck, threw her down the stairs, and forced her to sit on the couch. The co-defendant forced Divin Wright onto the same couch. The Petitioner and co-defendant were both armed, and the Petitioner accused Ms. Hancock of setting up a break-in of his home by Oliver Wright, Divin's brother. The Petitioner and co-defendant told both victims they would die that night.

Mr. Talley and Mr. Brown brought Mr. Coleman out of his car and into the house. Javon Bryant arrived at the house, pointed two guns at Ms. Hancock, and told her that she would help them find Oliver Wright. Mr. Bryant and the co-defendant forced Ms. Hancock into a car and drove away. The co-defendant later called Oliver Wright, arranged a meeting, and called the Petitioner to notify him. Mr. Brown drove the co-defendant's car, a Dodge Intrepid, to meet the co-defendant and Mr. Bryant. They forced Ms. Hancock to the Intrepid at gunpoint and waited for Oliver Wright. When Oliver Wright arrived, his passengers included Mr. Carpenter, Ms. Somerall, and her son. Two assailants surrounded the car, a Dodge Neon, and forced Oliver Wright and Mr. Carpenter to get out and remove their clothes.

The co-defendant forced Oliver Wright into the trunk of the Intrepid and closed the trunk on his leg, breaking his leg. The assailants forced Mr. Carpenter into the trunk of the Neon, with Ms. Somerville and her son still held at gunpoint in the Neon. Mr. Ezell drove the Neon, and Mr. Bryant drove the Intrepid. They later pulled over, and the assailants released Ms. Somerville and her son, allowing her to drive away in the Neon after they took her identification and threatened to kill her and her son if she called the police. They put Mr. Carpenter in the trunk of the Intrepid with Oliver Wright and told Ms. Hancock they would kill both men. They drove Ms. Hancock to a location near her mother's house, allowed her to get out, and threatened to kill her and her daughter if she called the police. Ms. Hancock testified that the assailants robbed her of $120 and that she later called the police. Ms. Somerville also called the police.

-2-

Divin Wright testified that after the co-defendant and Mr. Bryant left Ms. Vaughn's house with Ms. Hancock, the Petitioner pointed a pistol at him and took everything in his pockets. He testified that he was stripped naked and beaten by Mr. Ezell. Mr. Coleman testified that he was also stripped and that his checkbook was taken. The co-defendant and other assailants later brought Oliver Wright and Mr. Carpenter into the house. According to the victims who were in the house, the Petitioner and co-defendant beat Divin and Oliver Wright with their fists and guns, forced Divin's head into the smoldering fireplace, burned Oliver Wright's back with cigarettes, and poured bleach on Mr. Coleman, Mr. Carpenter, and both Wright brothers. Mr. Coleman also testified that he was hit in the head when he tried to escape and that the co-defendant ripped off Mr. Coleman's pants and shook out the pockets as both the co-defendant and the Petitioner asked, "Where's my stuff?"

The armed Petitioner joined with other assailants to force Mr. Coleman and Mr. Carpenter into the trunk of Mr. Coleman's car, a Ford Focus. Oliver and Divin Wright were forced into the trunk of the Intrepid. Oliver Wright testified that the assailants told him he was going to die and that they drove the cars until they stopped at a place where he could hear a train approaching. The police later arrived and released the victims from the car trunks. The Petitioner testified that he "wasn't involved in none of these incidents" and had been "at home with [his] child and [the] baby's momma." See id., slip op. at 1-5.

The jury convicted the Petitioner of five counts of especially aggravated kidnapping of victims Kimberly Hancock, Divin Wright, Oliver Wright, Omar Coleman, and Jerome Carpenter and three counts of aggravated robbery of Divin Wright, Oliver Wright, and Omar Coleman. The Petitioner filed a petition for post-conviction relief on March 15, 2005.

At the post-conviction hearing, Derrick Rucker testified that he was employed at an auto body shop until he injured his back six weeks before the hearing. He said he and the Petitioner were close friends and knew each other for more than fifteen years. He said that he was present for the Petitioner's trial on the morning of September 4, 2002, and that he watched two or three people testify before the lunch recess. He said that he went to lunch with two other friends and that when they returned, the bailiff told them they could not enter the courtroom for a security purpose. He denied that any problems occurred that morning or that the judge or bailiff spoke to him or his friends about their behavior or appearance. He said there was nothing disruptive or improper about their behavior or appearance. He said his purpose for going to court was to support his friend because the Petitioner's aunt was unable to attend the trial.

On examination by the court, Mr. Rucker testified that more than eight people were involved in the trial and that multiple people were in the audience. He said the case was "high profile" and covered extensively by television news. He remembered that the charges

included violent crimes and thought the case involved attempted murder. He said that the media tried to make it look like the case was related to gang activity but that he was not a "gangster" and neither were his friends. He said he and his two friends were the only persons kept out of the courtroom. He said his past convictions included burglary, possession of marijuana, and some misdemeanors.

On further direct examination, Mr. Rucker testified that his felony drug conviction was in 2004 and that he was last released from custody on July 7, 2008. He said he had no problems with the law since then.

On cross-examination, Mr. Rucker agreed that the Petitioner's charges were "something similar" to especially aggravated kidnapping and aggravated robbery. He agreed there were at least three victims whom he saw ready to testify and said he also thought a little boy was a victim. He said that he and his friends asked why they could not return to the courtroom and that the bailiff would tell them only that it was for a security reason. On examination by the court, Mr. Rucker testified that he went through the security system at the courthouse on the day of the trial.

Troy Hughlett testified that he had been employed for two years at a warehouse. He said he and the Petitioner had been good friends for fifteen or twenty years. He said he was in the courtroom on the morning of September 4, 2002, with Mr. Rucker and Mario Wrenthrob. He said that the Petitioner's family was not there that morning and that he attended the trial to support the Petitioner. He said that while he and his friends were at the trial, no one spoke to them about their behavior or appearance. He said that when the court recessed, he and his friends went downstairs in the courthouse to eat lunch. He said that when they tried to return to the courtroom, the bailiff stopped them and said they had been barred. He said the bailiff did not explain the reason.

On cross-examination, Mr. Hughlett testified that the bailiff did not give him or his friends an opportunity to ask why they had been barred from the courtroom. He agreed that many people were in the courtroom and that it was a newsworthy case. He said he did not remember the charges against the Petitioner or anything else about the case. He said he had no felony convictions.

On examination by the court, Mr. Hughlett testified that he did not attempt to attend the trial after that day. He said he and his friends heard one woman testify before the lunch recess. He said he was not present for the jury selection. He said the Petitioner and the Petitioner's brother were on trial.

Mario Wrenthrob testified that he had been employed at McDonald's for about a year and that he and the Petitioner had been friends for many years. He said he attended the first day of the Petitioner's trial to support the Petitioner and "to see what was really going on." He did not think the Petitioner's family was able to attend. He said that neither the judge nor the bailiff told him or his friends their clothing or behavior was inappropriate and that there was nothing inappropriate about their clothing or behavior. He said that he left the courtroom for the lunch recess with his friend and his cousin and that when they returned, they were told they could not enter. He said the only reason given was a "security purpose." He said he knew of no one else who was not allowed to enter the courtroom.

On cross-examination, Mr. Wrenthrob testified that he asked the bailiff why they could not reenter the courtroom but that the bailiff would only say it was for security reasons. He said they left after they were barred. He did not remember news personnel at the trial or whether the case was gang-related. He said he had been convicted of a misdemeanor marijuana charge but not a felony.

On the court's examination, Mr. Wrenthrob testified that when the bailiff told him and his friends they could not enter the courtroom, the door had closed but they were about to enter. He denied being asked to leave while court was in session.

The Petitioner's counsel testified that he practiced primarily in criminal defense. He said that Mr. Rucker looked "vaguely familiar" but that he had never seen Mr. Hughlett or Mr. Wrenthrob.

At this point, the trial court noted for the record:

> [H]is friends all left. And, one of them I believe Mr. Rucker was trying to talk with Mr. Williams when he was leaving. The officers had to tell him not to communicate with Mr. Williams. His close friends are now gone.

Counsel testified that he vaguely remembered that someone was told to leave the courtroom at the trial because of a security issue but that he did not remember specific details. He said he reviewed his notes from the trial and did not find any mention of people excluded from the trial. He said that it was a difficult trial and that he was occupied with the job at hand. He remembered that a bailiff mentioned the exclusion of some individuals for security reasons. He said, "It didn't shock me to the point that I objected or to the point that I took notes on it." He said he would usually note anything that might need to be raised in a motion for new trial or on appeal.

Counsel testified that he thought he was told when he returned from the lunch recess by either a bailiff or the judge about the exclusion of individuals. He did not know if the Petitioner was told. He did not remember any discussion in court regarding whether the individuals should be excluded. He said that if the trial court had explained that it was considering the exclusion, he would have objected because his client needed support. When asked why he did not raise an objection or raise the issue in the motion for new trial, he said he did not remember. He said he reviewed the trial transcript and his notes but found no mention of the individuals' exclusion from the courtroom. He noted that it had been eight years since the trial. He agreed it was a possibility that there was "nothing to remember" about the issue.

Counsel testified that around the time of this trial and in the same courtroom, he was involved in a murder trial during which an individual or two were asked to leave because of their clothing. He said that as he tried to remember what happened in this trial, he began to confuse the two. He said the courtroom audience for the Petitioner's trial was divided into prosecution and defense sides. He said that the case involved seven victims and that there was a great deal of support on the prosecution's side but very little on the Petitioner's side. He did not remember meeting the Petitioner's parents and did not remember any of the Petitioner's family attending the trial.

On cross-examination, counsel testified that he had practiced criminal law for over ten years and that he had represented defendants in ten to fifteen jury trials and about the same number of bench trials. He said the Petitioner and his brother were both charged with multiple counts of especially aggravated kidnapping and aggravated robbery. He agreed that the District Attorney's Office labeled the Petitioner's case a "gang case" and that the trial prosecutor was the gang crime prosecutor. He said the trial lasted at least five days. He said four of the seven victims knew the Petitioner before the offenses occurred. He said he did not remember if the Petitioner asked him to object when his friends were barred from the courtroom. On redirect examination, counsel testified that he did not know whether the Petitioner was aware of his friends' exclusion from the courtroom during the trial.

On examination by the trial court, counsel testified that he was aware during the trial that the Petitioner had friends there in support of him and that when the bailiff told him individuals were excluded, he knew they were supporters of the Petitioner. He said he reviewed the trial transcripts and found no mention of the individuals' exclusion. He said that he hoped he would have objected and asked for a hearing if the Petitioner told him that his friends were excluded but that he did not recall whether the Petitioner said anything. He said that the State's witnesses were terrified and that the atmosphere was tense.

The Petitioner testified that his trial began on September 4, 2002, and lasted four days. He said that Mr. Rucker, Mr. Hughlett, and Mr. Wrenthrob were his good friends and that he had known them for fifteen or twenty years. He said they had nothing to do with the offenses in the case and were at the trial to support him. He said his family was not at the trial because counsel told him the case would be continued. He said that he was surprised that the trial started when it did. He said that his three friends were in the courtroom the first morning of the trial but not after the lunch recess and that he learned of their exclusion when he called home that night. He said his friends did not cause a disruption with their behavior or appearance. He did not remember if the judge told him about the exclusion and said he would have asked counsel to object if he had known.

On cross-examination, the Petitioner testified that to his knowledge, counsel did not know about his friends' exclusion. He denied that his friends caused a disruption when they left the post-conviction hearing. He agreed that one friend said something to him before leaving and said that the friend asked if he wanted some money on his books. He denied that his friends were smiling and laughing and that one friend gave him a sign with his hands. He said he did not see his friends do anything wrong at the post-conviction hearing or the trial. He said that his family lived in Chattanooga and that they offered to attend the trial, but that he told them he was okay and they did not need to attend.

On redirect examination, the Petitioner testified that he thought he said something to counsel about his friends' exclusion but that he was not sure. He said that although he asked counsel to include the issue on appeal, counsel refused. He agreed that if his family lived in Memphis, he would have asked them to attend, but he said that the six-hour drive from Chattanooga was too much for them when he already had friends there to support him. On recross-examination, the Petitioner testified that the State appointed counsel to represent him on appeal.

On further redirect examination, the Petitioner testified that when his friend asked during the post-conviction hearing if he wanted money on his books, it meant on his account at the jail commissary. In response to a question from the court, the Petitioner agreed court officers told his friends to stop talking to him during the post-conviction hearing and to leave the courtroom. The trial court accepted a copy of the trial transcript as an exhibit and requested that defense counsel mark the section containing the lunch recess at issue for the court's review.

The prosecutor testified that she vaguely remembered an incident during the first day of the trial when the judge would not allow three young men to return to the courtroom after the lunch recess. She said that she was assigned to the District Attorney's Office gang unit at the time of the trial and that her unit considered the Petitioner's case to be gang-related.

She said that there were seven victims and six defendants in the case and that there were many people present in the courtroom during the trial. She said the victims were frightened and easily intimidated. She said they told her that people in the courtroom were gesturing and making faces at them or saying things. She told the trial court, and it ruled that none of the victims had to "go through that"and excluded the three individuals. She said that one of the victims recognized at least one of the excluded individuals and that the court officer obtained the individuals' names. She said her conversation with the judge was not on the record but was held openly in court.

On examination by the court, the prosecutor testified that she received an excerpt of the trial transcript provided by the Petitioner's post-conviction counsel. She said that Ms. Somerville was on the witness stand before and after the exclusion occurred and that Ms. Somerville's young son still had to testify. She said specific individuals were brought to her attention and were excluded from the courtroom. She said that the trial court did not address the excluded individuals because the court ruled to exclude them before they returned to the courtroom and that after the ruling, the bailiff did not admit them. She agreed the incident occurred during the second day of testimony and third day of the trial. She said testimony that day began with Omar Coleman, who was followed by Ms. Somerville and her son. On redirect examination, she testified that the jury was not in the courtroom when she brought the witnesses' concern to the trial court's attention or when the court ruled to exclude the individuals.

In a written order denying post-conviction relief, the trial court stated:

> A review of the trial transcript shows that on September 5, 2002, three individuals were, in fact, barred from the courtroom. The trial court said the following:
>
>> "The court: All right. The three young men that were seated on this side of the courtroom early this morning. They're not here now. They're not to be allowed back in the courtroom for the duration of the trial. We can't have the conduct that is threatening in any manner or suggest intimidation in any manner. And so if that continues they'll just be kicked out of the courtroom. It's as simple as that. Bring in the jury, please."
>
> . . .

Petitioner produced three witnesses who purported to be friends of Petitioner. Each of the witnesses testified during the hearing that they attended Petitioner's trial during the morning hours, but after lunch recess, they were denied access to the courtroom. They indicated that there was no type of disturbance, but that courtroom bailiffs kept them out of the courtroom for security reasons.

. . .

Petitioner's complaint about closing the courtroom to his friends is denied for two reasons. First, and foremost, Petitioner raised this complaint for the first time in his Petition for Post-Conviction Relief. No objection was made to the trial court at the time the partial closure occurred. Petitioner testified that he found out about the closure after the court had adjourned for the day, but neglected to inform trial counsel the following day when the trial continued. Thus, the trial court was never given the opportunity to address this alleged complaint.

Secondly, although the trial court did not conduct a formal jury out hearing, it is clear that a complaint was communicated to the court, and three individuals were identified and barred from the courtroom. The court articulated reasons on the record for the partial closure. Some type of threat was communicated to witnesses during the trial, and the court was made aware of such and took steps to eliminate the threat. In response, the court ordered the individuals responsible for the threats to be excluded from the courtroom. This Court finds that the actions taken by the trial court were reasonable under the circumstances.

For the foregoing reasons, Petitioner's complaints about partial trial closure are without merit and are denied.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2010); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). A petitioner is required to provide "allegations of fact explaining why each ground for relief was not previously presented in any earlier proceeding." T.C.A. § 40-30-104(e) (2010). On appeal, we are bound by the trial

court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2010).

**I**

The Petitioner contends that the trial court violated his constitutional right to a public trial by closing the courtroom to his three friends without following the requirements for partial closure set out in Waller v. Georgia, 467 U.S. 39, 46-47 (1984). The State contends that the trial court correctly found that the Petitioner waived this issue for post-conviction relief by failing to raise it on direct appeal. See T.C.A. § 40-30-106(g) (2010). We agree with the State.

The right to a public trial is guaranteed by the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. To avoid violating a defendant's right to a public trial, the trial court should hold a jury-out hearing before closing or partially closing the trial, determine whether the party seeking to close the hearing has an overriding interest that is likely to be prejudiced without the closure, confine the closure to only that necessary to serve such an interest, consider alternatives, and make findings adequate to support the closure. See Waller, 467 U.S. at 48; State v. Sams, 802 S.W.2d 635, 640 (Tenn. Crim. App. 1990). As the Petitioner notes, if the record shows a violation of the right to a public trial, prejudice requiring reversal is implied. See State v. Tizard, 897 S.W.2d 732, 749 (Tenn. Crim. App. 1994); Sams, 802 S.W.2d at 641 (noting that to require actual proof of prejudice "would seriously impair, if not actually destroy, the safeguards provided by the public trial requirement").

In this case, however, we conclude that the Petitioner waived his public trial claim by failing to raise it in the trial of his case and on direct appeal. A constitutional claim for relief that was not raised when it could have been raised in an earlier proceeding is waived for post-conviction relief unless the constitutional right was not recognized at the time of the trial or was not raised as a result of a State or federal action. See T.C.A. § 40-30-106(g). Neither exception applies in this case, and the Petitioner is not entitled to relief on this issue.

**II**

The Petitioner contends that counsel rendered ineffective assistance by failing to object to partial closure of the trial and failing to raise the issue on direct appeal. He argues and the State concedes that the trial court, in both its written order denying post-conviction relief and its ruling from the bench, failed to address whether the Petitioner received the

ineffective assistance of counsel. We agree that the trial court failed to address this claim, and we conclude that the trial court's order denying post-conviction relief is incomplete.

The Post-Conviction Procedure Act mandates that the trial court enter an order or written memorandum detailing all grounds presented by the Petitioner and its findings of fact and conclusions of law with respect to each ground. See T.C.A. 40-30-111(b) (2006) (amended 2009). The purpose of this requirement is to facilitate appellate review. See State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984); cf. State v. Higgins, 729 S.W.2d 288, 290-91 (holding that the trial court's failure to state findings of fact and conclusions of law regarding each issue of the defendant's claim in its written order was harmless because the court's oral findings from the bench on each issue were included in the appellate record). Although we held in Section I that the Petitioner waived any complaint of a constitutional violation as a result of the trial court's partial closure of the courtroom when he failed to raise it in the conviction proceedings or direct appeal, it does not necessarily follow that he is not entitled to relief on the basis of this constitutional claim of ineffective assistance of counsel. We are unable to review the Petitioner's claim of ineffective assistance of counsel because the trial court did not rule on this issue. See T.C.A. § 40-30-111(b); Tenn. Sup. Ct. R. 28 § 9(A).

In consideration of the foregoing and the record as a whole, the judgment of the trial court is reversed, and the case is remanded to the trial court for findings of fact and conclusions of law on the Petitioner's ineffective assistance of counsel claim.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE